[No. B151279. Second Dist., Div. Seven. Oct. 23, 2001.]

Adoption of BABY BOY D., a Minor.
STEPHEN V. et al., Plaintiffs and Appellants, v.
DOLORES D., Defendant and Respondent.

**COUNSEL**

John L. Dodd & Associates, John L. Dodd; Gradstein & Gorman, Jane A. Gorman and Marc Gradstein for Plaintiffs and Appellants.

Schmiesing, Blied, Stoddart & Mackey and Timothy S. Blied for Plaintiff and Appellant Bethany Christian Services.

Curtis V. Leftwich for Defendant and Respondent.

Michael J. Kretzmer for Minor.

**OPINION**

**WOODS, J.**—Adopting parents Stephen and Sandra V. appeal from an order transferring custody of the minor, Baby Boy D., from the adopting parents to the birth mother, Dolores D. This case involves an agency adoption in which the birth mother did not initial one of 20 boxes on a form known as a statement of understanding supplied by the California Department of Social Services (DSS). We conclude the crux of this appeal is whether there was an effective relinquishment by the birth mother terminating her parental rights. We reverse as we conclude there was an effective relinquishment.

FACTUAL AND PROCEDURAL SYNOPSIS

I. *The Adoption Process*

On December 3, 1999, the V.'s entered into an agency adoption agreement with Bethany Christian Services (Bethany),[1] a California adoption agency. Bethany was to provide adoption services for a fee.

Dolores, who was 31 years old, unmarried, and the mother of three other children by three different men, discovered she was pregnant again in approximately July 2000. The father of this child, Robert S., has not been located to this day.

On about December 18, Dolores called Bethany to make an appointment to receive counseling concerning her pregnancy and the possibility of placing her unborn child for adoption. On January 4, 2001, Dolores met with Bethany representative Claudine Johnson to begin adoption planning. Dolores received a copy of the statutorily required relinquishment form. At the first meeting, Dolores told Johnson she wanted to place the child for adoption.

On January 16, Dolores looked at profiles for prospective adoptive parents. Dolores wanted the prospective adoptive parents to have a stable marriage of at least eight years and the adoptive child to be the couple's first child. On January 30, Dolores met with the V.'s for the first time. On February 6, Dolores met with the V.'s again and agreed to select them as the adoptive family.

Final arrangements were worked out on February 14. Dolores was emotional about the adoption, especially in light of her mother's criticism of her allowing the adoption to occur. The minor was born on February 16.

On February 18, the V.'s signed numerous documents concerning the placement of the minor with them, one of which was the "Legal Risk Adoption Agreement," which notified them there were legal risks to adoption and placement could be disrupted. That day, Dolores signed the "Health Facility Minor Release Report," which granted the V.'s permission to take the child home with them, which they did that day.

On February 19, while still at the hospital and still emotional, after Johnson had reviewed the paperwork with Dolores, Dolores executed the statutorily required relinquishment form (Relinquishment), placing the minor

---

[1]Bethany filed a letter joining in appellants' opening and reply briefs.

for adoption. Dolores had no questions when she signed the Relinquishment and "signed the relinquishment knowingly, intelligently and voluntarily."

The signed Relinquishment stated the birth mother does "hereby relinquish and surrender said child for adoption to Bethany . . . ." The Relinquishment also stated: "It is fully understood by me/us that when this relinquishment is filed with the headquarters office of the State Department of Social Services—Adoptions Branch by said agency, all my/our rights to the custody, services and earnings of said minor child and any responsibility for the care and support of said minor child will be terminated."

Dolores also read and executed DSS's statement of understanding (SOU) after Johnson reviewed that form with her. Dolores "understood the statement of understanding and had no questions when she signed" the SOU.

The SOU is a four-page form generated by DSS for use in agency adoptions. It informs the birth parent: "Relinquishing a child means permanently giving the child to the adoption agency so the agency can choose other parents to adopt the child. You permanently give up the child to the adoption agency by signing this Statement of Understanding and the Relinquishment document. You will no longer have any rights as a parent to your child once these documents have been filed with the California Department of Social Services, Adoption Branch."

The SOU contained a bold-faced advisement on the first page, stating: "BEFORE YOU SIGN THIS STATEMENT OF UNDERSTANDING AND THE RELINQUISHMENT DOCUMENT, READ BOTH VERY CAREFULLY WITH YOUR SOCIAL WORKER. BE SURE TO ASK QUESTIONS ABOUT ANYTHING YOU DO NOT UNDERSTAND."

The SOU also contained 20 separate advisements and statements which were to be initialed by the birth parent, 19 of which Dolores did initial. The form advises the parent, inter alia, of the right to an attorney; the right to counseling with various professionals; the right to advice as to alternatives to adoption; the fact the parent will no longer have any rights to the child; the fact that once the documents are filed with DSS, they are final and the birth parent cannot stop the adoption unless the agency agrees; and the fact the parent may chose to have the Relinquishment form filed immediately or the agency may hold the form for 30 days.

After Johnson explained the time frame for filing the documents in Sacramento, Dolores wanted them filed immediately. On about February 21, Bethany faxed the adoption paperwork to DSS in Sacramento, including the SOU and the Relinquishment.

Dolores inadvertently failed to initial box 20 on the SOU, which states: "I have carefully thought about the reasons for keeping or giving up my child. I have discussed the adoption plan of my child with the adoption agency, and I have decided giving up my child to the agency for adoption is in the best interest of my child. I have read and understand the Statement of Understanding and the relinquishment document. I do not need any more help or time to make my decision. I have decided to relinquish my child permanently to Bethany . . . for adoption and I am signing this freely and willingly."

Less than one inch below box 20, Dolores signed the form, stating she had understood and agreed to the statements she had initialed and then also signed the form again approximately two inches below that.

Dolores also signed a "Free Will Declaration," a form used by Bethany, which stated: "I, Dolores . . . declare under penalty of perjury that I am making the decision to place my child for adoption through Bethany . . . of my own free will and based on the full and complete knowledge of all my parenting options. [¶] I further declare that I am not being coerced by anyone into making this decision."

When Dolores's deposition was taken on May 16, 2001, she testified it was her intent when she signed the Relinquishment that the child be adopted. Dolores understood at that time that her rights to the child would be terminated when the Relinquishment was filed with DSS. Dolores understood that relinquishing the child meant giving him up permanently for adoption. Dolores testified she understood the meaning of each of the advisements in the boxes she did initial and affirmed it was her intent that day to give up her right of custody to the child.

Dolores testified she understood the contents of box 20 and intended to initial box 20 at that time; Dolores thought she had initialed box 20; it was merely an oversight she did not do so. It was a true statement she had " 'carefully thought about the reasons for keeping or giving up my child.' " It was true she had discussed the adoption plan with the agency and had " 'decided giving up my child to the agency for adoption is in the best interest of my child.' " Dolores testified the statements, " 'I have read and understand the Statement of Understanding and Relinquishment document,' " and " 'I do not need any more help or time to make my decision,' " were true. It was also true Dolores signed the document " 'freely and willingly.' "

Johnson discussed box 20 with Dolores at the time. Johnson went through it carefully. It was not initialed because "[w]e just missed it."

## II. *Processing the Relinquishment*

About February 22, Lori Wallbridge of DSS confirmed receipt of the Relinquishment. Wallbridge refused to "acknowledge" the Relinquishment because Dolores had not initialed box 20 on the SOU. DSS requested an affidavit from the birth mother so it could acknowledge the Relinquishment.

The denial of acknowledgment was faxed to Bethany on about February 22. When Johnson reviewed the denial, she believed she could solve the problem by providing a letter affidavit.

As of March 8, Dolores wanted the adoption to proceed. In the middle of March, Dolores decided to try and stop the adoption and looked for adoption information on the Internet.

On March 14, Bethany sent a letter affidavit, authored and signed by Johnson, but not under penalty of perjury, to Wallbridge; the affidavit stated the birth mother failed to initial box 20.

On March 21, DSS sent a document denying acknowledgment of the Relinquishment and indicating the affidavit must be from the birth mother and for Johnson to call Wallbridge for further directions. Shortly thereafter, Johnson spoke with Wallbridge by phone. Wallbridge told Johnson the necessary affidavit had to be signed by the birth mother and sent Johnson a sample affidavit. Based on the sample affidavit, Johnson believed she could write and sign the affidavit, and on March 23, Johnson sent DSS a second letter affidavit she had authored and signed—this time under penalty of perjury. The letter affidavit stated Dolores's failure to initial box 20 was an oversight.

On April 9, a third denial of acknowledgment was sent by DSS. The form indicated the affidavit must be signed by the birth mother and asked Bethany to submit an affidavit from the birth mother.

On April 9, Dolores went into the Chino office of Bethany and requested information about how to get her child back. Dolores then signed a revocation of Relinquishment because she wanted to regain custody of her child. At that time, Dolores learned from a representative of Bethany she had inadvertently failed to initial box 20 and that failure had caused DSS to refuse to acknowledge the Relinquishment.

On April 11, Dolores went to the Chino office of Bethany and declined to sign new relinquishments and said she wanted to regain custody of her child.

On April 12, Dolores presented her signed statement of revocation to Bethany. On April 13, there was some discussion between Dolores and Bethany about returning the child to Dolores. Bethany subsequently set April 18 at its Chino office as the time and place for child to be released to Dolores.

On May 25, 2001, the depositions of DSS employees Wallbridge and Ben Jones were taken. That deposition testimony was admitted into evidence by stipulation. Wallbridge testified DSS required the SOU so the birth mother "knows exactly what she's getting into when she signs this document." It is written DSS policy that an uninitialed box on the SOU automatically results in a relinquishment not being acknowledged; there is no discretion. It is DSS policy that in order to cure the defect of an uninitialed box on the SOU, the birth mother must submit an affidavit that the failure to initial was merely an oversight, and until that happens, the Relinquishment cannot and will not be acknowledged by DSS. DSS never acknowledged the Relinquishment herein because it never received an affidavit from the birth mother. The two affidavits submitted by Bethany did not meet DSS policy requirements. Wallbridge's receipt and acknowledgment of a relinquishment in another case where box 20 had not been initialed was a mistake; that relinquishment should not have been acknowledged. DSS considers the SOU to be part of the Relinquishment.

Jones was Wallbridge's supervisor. He testified it was DSS policy that an uninitialed box resulted in a relinquishment not being acknowledged. Though unwritten, it was long-standing DSS policy that in order to cure the defect of an uninitialed box, the birth mother must submit an affidavit or a new relinquishment. Wallbridge had acted within DSS regulations in deciding not to acknowledge the Relinquishment. DSS treated the SOU and Relinquishment as one document. The purpose of the SOU is "to verify that the birth mother understands what she is doing in broad terms." Wallbridge should not have acknowledged the SOU in the other case where the box 20 had not been initialed.

III. *Court Action*

On April 18, the V.'s filed an "Application To Declare Relinquishment Valid" and requested the court order DSS to accept and acknowledge the Relinquishment, thereby terminating Dolores's parental rights. The V.'s further petitioned the court to allow them to maintain physical custody of the child until the legal issues were adjudicated.

On May 16, Dolores filed a combined petition for writ of habeas corpus and trial brief. Dolores argued the Relinquishment was not complete because box 20 had not been initialed and DSS had correctly not acknowledged it, thereby leaving her parental rights intact.

The court conducted an evidentiary hearing, which consumed multiple days of testimony. The court heard testimony from the parties, read the depositions of DSS and Bethany personnel, and heard expert testimony from Dr. Nancy Kaser-Boyd and Dr. Frederica Conrad about possible detriment to the minor and whether the minor's best interest would be served by returning the child to Dolores or remaining with the V's.

The court found that the Relinquishment was defective in that it was not complete and had not been corrected and that DSS acted within its authority by refusing to acknowledge the Relinquishment and by requiring an affidavit from the birth mother. The court found it could not ignore the defective Relinquishment. The court then addressed the issue of whether it was mandatory for the child to be returned to Dolores. The court noted it had equitable power to make that determination but would not order the child be returned to Dolores if doing so would create "serious substantial harm" to the child. The court found there would be no serious substantial harm if the child was returned to Dolores. The court also found the best interest of the child was equally balanced between the V.'s and Dolores. Accordingly, the court ordered the child be returned to Dolores on a gradual basis.

The V.'s filed a timely notice of appeal. Subsequently, the V.'s filed a petition for writ of supersedeas and request for immediate stay. This court stayed the part of the superior court's order directing the child's return to Dolores's custody and the part of the order providing for weekend visitation. This court left the part of the order providing for three hour visits three times a week in full force and effect.

DISCUSSION

The case at bar involved fundamental constitutional rights. ██ "A parent's interest in the companionship, care, custody and management of his [or her] children is a compelling one, ranked among the most basic of civil rights. [Citation.] Likewise, natural children have a fundamental independent interest in belonging to a family unit [citation], and they have compelling rights to be protected from abuse and neglect and to have a placement that is stable, permanent, and that allows the caretaker to make a full emotional

commitment to the child. [Citation.]" (*In re Marilyn H.* (1993) 5 Cal.4th 295, 306 [19 Cal.Rptr.2d 544, 851 P.2d 826]; see also *In re Jasmon O.* (1994) 8 Cal.4th 398, 419 [33 Cal.Rptr.2d 85, 878 P.2d 1297].) "[I]t is well established that a prospective adoptive parent with whom a child has been placed for adoption has a liberty interest in continued custody." (*Adoption of Baby Girl B.* (1999) 74 Cal.App.4th 43, 51 [87 Cal.Rptr.2d 569]; see also *In re Bridget R.* (1996) 41 Cal.App.4th 1483, 1504-1505 [49 Cal.Rptr.2d 507] [right of minor to stable placement and family relationship with adoptive family].)

Because of those fundamental rights, the court should have conducted an independent review of the situation presented in the V.'s' application to declare the Relinquishment valid. (See *Marten v. Thies* (1979) 99 Cal.App.3d 161, 171 [160 Cal.Rptr. 57]; *C. V. C. v. Superior Court* (1973) 29 Cal.App.3d 909, 919 [106 Cal.Rptr. 123].) The parties stipulated to the basic facts. ▇ As the crucial question of whether the Relinquishment was valid involves issues of constitutional and statutory interpretation, a question of law, and undisputed facts, our review is de novo. (See *Redevelopment Agency v. County of Los Angeles* (1999) 75 Cal.App.4th 68, 74 [89 Cal.Rptr.2d 10]; *Engs Motor Truck Co. v. State Bd. of Equalization* (1987) 189 Cal.App.3d 1458, 1464 [235 Cal.Rptr. 117].)

In relevant parts, Family Code section[2] 8700 provided:

"(d) The relinquishment authorized by this section has no effect until a certified copy is filed with the department [DSS]. Upon filing with the department, the relinquishment is final and may be rescinded only by the mutual consent of the department or licensed adoption agency to which the child was relinquished and the birth parent or parents relinquishing the child." [¶] . . . [¶]

"(h) The filing of the relinquishment with the department terminates all parental rights and responsibilities with regard to the child, except as provided in subdivisions (f) and (g)."[3]

DSS regulations further define "filing" as "receipt and acknowledgment." (See Cal. Code Regs., tit. 22, § 35000, subd. (f)(3); see also §§ 35152.1, subd. (b)(1)(P), 35153, subd. (a)(1) & 35169, subd. (b)(1).) DSS refused to acknowledge the Relinquishment because box 20 on the SOU had not been

---

[2]All statutory references are to the Family Code.

[3]The exception is not applicable in this case.

initialed and Bethany did not provide an affidavit from Dolores attesting to the fact her failure to initial that box was inadvertent. Subsequently, Dolores signed a revocation of the Relinquishment and Bethany set a date for the child to be returned to Dolores. The V.'s then filed an application to declare the Relinquishment valid.

In *In re Bridget R., supra*, 41 Cal.App.4th 1483, the biological parents of twin girls had initially voluntarily relinquished the girls to an adoption agency, but later sought to invalidate the relinquishments on the basis the relinquishments had not been executed in the manner required by the Indian Child Welfare Act (25 U.S.C. § 1901 et seq.). The court reasoned: "A biological parent's constitutional rights, like other constitutional rights, may be waived, provided only that the waiver is knowingly and intelligently made [citations], and the counselling which is required by California law before a parent may relinquish a child for adoption has been held to be sufficient to assume that any waiver of parental rights is knowing and intelligent. [Citation.]" (*Bridget R.*, at p. 1506, italics omitted.)

The court here found the issues before it were whether DSS should have accepted the Relinquishment and whether DSS acted reasonably in not acknowledging the Relinquishment and requiring an affidavit from the birth mother. The court found the Relinquishment was incomplete because box 20 on the SOU had not been initialed and that DSS acted reasonably. The court determined it was limited to deciding the issue of whether the Relinquishment was complete and it could not ignore the fact the Relinquishment was defective on its face.

▮ Given the rights at stake and the independent standard of review, we conclude the court should have done more than review the action of DSS and determine if the Relinquishment was complete; it should have determined whether the Relinquishment was valid (i.e., whether it was a knowing, intelligent waiver of parental rights). (See *San Diego County Dept. of Pub. Welfare v. Superior Court* (1972) 7 Cal.3d 1, 15 [101 Cal.Rptr. 541, 496 P.2d 453] ["In a case where the Department of Social Welfare [now DSS] recommends against the adoption or refuses its consent thereto, the court is charged with the responsibility to determine whether or not the welfare of the child would be promoted by granting the petition."]; see also *Adoption of Barnett* (1960) 54 Cal.2d 370, 377-379 [6 Cal.Rptr. 562, 354 P.2d 18].)

In *Tyler v. Children's Home Society* (1994) 29 Cal.App.4th 511 [35 Cal.Rptr.2d 291], the birth parents sought to rescind, i.e., have declared void,

the relinquishments they had signed on the basis the adoption agency and its employee had failed to comply with DSS regulations. There was conflicting evidence as to whether the adoption agency had complied with some regulations. The Court of Appeal concluded the defendants had "violated the DSS regulations by failing to (1) discuss the alternative of placing the baby with extended family members, (2) discuss educational or employment resources, (3) give a copies of the executed documents to plaintiffs, and (4) obtain [the father's] medical history." (*Id.*, at p. 552.)

The court in *Tyler* concluded that under the doctrine of constructive fraud, regulatory violations provided a basis for rescission of relinquishments if a relinquishing parent had been misled to his or her prejudice by the adoption agency's violation of regulations, i.e., if the violations had affected the parent's decision to relinquish. (*Tyler v. Children's Home Society, supra,* 29 Cal.App.4th 511, 527, 538.) In making the determination of whether the parent had been prejudiced, the court noted a "contract of relinquishment cannot be rescinded when it appears that consent would have been given and the contract entered into notwithstanding the fraud or undue influence." (*Id.*, at p. 529.)

Dolores argues that *Tyler* is not analogous as the relinquishments there had been received and acknowledged by DSS. Although *Tyler* is not directly on point, some of its reasoning is pertinent to the issue of the validity of the Relinquishment signed by Dolores. ■ " 'Relinquishments, once executed, must be relied upon in order to insure that children will not be forced out of one home and into another at the whims and caprice of emotionally upset and perhaps ill-advised persons. The state has expressed a strong policy in the necessity for giving effect to relinquishments, for to do otherwise would "open the door to practices which could conceivably discourage adopting parents from opening their hearts and homes to unwanted children . . . ." [Citations.]' Adoption requirements 'are to be liberally construed in order to effect the object of the adoption statutes in promoting the welfare of children, bereft of the benefits of the home and care of their real parents . . . .' [Citation.]" (*Tyler v. Children's Home Society, supra,* 29 Cal.App.4th 511, 529.)

The court noted "the manifest overall purpose of the regulations is to assure that relinquishments are given voluntarily and knowingly." (*Tyler v. Children's Home Society, supra,* 29 Cal.App.4th 511, 540.) Thus, the court determined: "[A]utomatic invalidation of the relinquishments is not necessary to further the purpose of assuring voluntary and knowing decisionmaking by the parents. That purpose is served by a rule of substantial compliance, which means 'actual compliance in respect to the substance essential to every reasonable objective' of the provisions." (*Ibid.*)

Similarly, we conclude the refusal of DSS to acknowledge Dolores's Relinquishment is not determinative of whether or not it was valid. The instant case involved a minor omission, not several regulatory violations as in *Tyler*. Unlike the parents in *Tyler*, Dolores had received all the requisite counselling, and Bethany had not committed any other regulatory violations. The undisputed evidence presented to the court established that Dolores intended to initial box 20 and believed she had done so and that Dolores's Relinquishment was voluntary and knowing, i.e., she had signed the paperwork freely and voluntarily with the specific intent to place her child for adoption at the time she signed the Relinquishment. Dolores admitted all the statements in box 20 were true.

Thus, that evidence established the Relinquishment substantially complied with every reasonable objective of the statute and regulations and thus was valid. To hold the Relinquishment was not valid based on the failure to check one of 20 boxes would be an exaltation of form over substance; something courts should seek to avoid. (Cf. *People v. Saunders* (1993) 5 Cal.4th 580, 593 [20 Cal.Rptr.2d 638, 853 P.2d 1093].) Accordingly, the court should have granted the V.'s' application to declare the Relinquishment valid.

Given our holding, we need not address the other issues raised by the V.'s. However, regarding the V.'s' complaint about the violation of due process because of the unwritten DSS policy requiring an affidavit from the birth mother to explain an unchecked box, we note that at the time DSS refused to acknowledge the Relinquishment, it had not been presented with Dolores's deposition testimony in which she admitted that her failure to initial the box was inadvertent and that she intended to consent to the adoption of her child at the time she signed the Relinquishment and the SOU. Dolores's deposition was not taken until after the V.'s' application in court. Moreover, based on the record before this court, it does not appear the Free Will Declaration signed by Dolores was forwarded to DSS.

DISPOSITION

The order denying the application to declare the Relinquishment valid and ordering that custody of the child be transferred from the V.'s to Dolores is reversed with directions to enter an order granting that application and directing DSS to receive and acknowledge the Relinquishment. The court is

directed to enter a further order terminating Dolores's parental rights pursuant to former section 8700, subdivisions (d) and (h).

Appellants to recover costs on appeal.

Johnson, Acting P. J., and Boland, J.,* concurred.

On October 30, 2001, the opinion was modified to read as printed above. Respondent's petition for review by the Supreme Court was denied January 16, 2002.

---

*Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.