[No. G035622. Fourth Dist., Div. Three. Feb. 28, 2006.]

In re MICHAEL R., a Minor.
SHERYL M., Petitioner and Appellant, v.
TAMMY R., Objector and Respondent.

## COUNSEL

John L. Dodd & Associates, John L. Dodd and Sharon L. Grier for Petitioner and Appellant.

Law Office of Marjorie G. Fuller, Marjorie G. Fuller; Metcalf & McKenzie and Timothy Metcalf for Objector and Respondent.

No appearance for Minor.

## OPINION

**ARONSON, J.**—Sheryl M. appeals from an order dismissing her petitions to free Michael R. from his birth mother Tammy R.'s parental custody and control on the ground of abandonment (Fam. Code, § 7820 et seq.; all statutory references are to this code unless otherwise noted) and to independently adopt him. (§ 8802.) We conclude Sheryl failed to demonstrate standing to adopt under section 8802 and therefore the family court did not err in dismissing her adoption petition. We also reject her claim she raised a prima facie case of parental abandonment under section 7822. Finally, we disagree with Sheryl's claim the family court lacked jurisdiction to alter the probate court's child custody order.[1] Accordingly, we affirm the order dismissing Sheryl's petitions.

### I

### FACTUAL AND PROCEDURAL BACKGROUND

A single mother with two other children, 36-year-old Tammy gave birth to Michael in November 2003. She was unmarried and did not cohabit with the man she identified as the biological father, Loren G. Tammy relinquished her son to a licensed adoption agency, Nightlight Christian Adoptions (NCA). The agency placed Michael with prospective adoptive parents Sheryl and Roger M. following the birth. In a document entitled, "Relinquishment," Tammy named the M.'s as the intended adoptive parents.

---

[1] Technically, California does not have "probate courts." "The term 'probate court' is but a convenient way of expressing the concept of a superior court sitting in exercise of its probate jurisdiction. This is but a colloquial expression . . . ." (*Copley v. Copley* (1978) 80 Cal.App.3d 97, 107 [145 Cal.Rptr. 437].) The same is true for the term "family court." We use these colloquialisms to distinguish between the two courts involved in this case.

On November 18, 2003, NCA petitioned to determine the extent of Loren's parental rights and whether his consent for the adoption was required. (§ 7662 [no adoption without judicial determination that nonrelinquishing parent's rights have been terminated or that consent is not required].) Loren timely petitioned in the probate court to establish a parental relationship.[2] NCA filed an amended petition in December.[3] The M.'s petitioned to adopt Michael in January 2004, and NCA joined in the petition. In February, the probate court joined the M.'s as necessary parties in Loren's action, and the family court consolidated the three proceedings and ordered genetic testing to determine whether Loren was Michael's biological father. After one postponement, the court scheduled a hearing for May 2004.

In early May 2004, the M.'s, NCA, and Loren entered into a postadoption contact agreement. (See § 8616.5.) Loren agreed to give up his parental rights, and the M.'s promised to inform Michael when he was older that Loren was his biological father and to permit four visits per year, among other provisions. The court signed the agreement, dismissed NCA's and Loren's petitions, and ordered that the adoption proceed without Loren's consent.[4]

In late August 2004, Sheryl petitioned to dissolve her marriage. On September 13, NCA notified Tammy of the pending divorce and that the couple could not meet Tammy's desire for a two-parent adoption of Michael. Tammy immediately notified NCA she intended to rescind her relinquishment, and submitted a formal written request to rescind on September 30.

On October 25, Sheryl petitioned the probate court for appointment as Michael's temporary guardian on the grounds that Tammy "may" rescind the relinquishment, "but there is no information that she has" and therefore a guardianship was necessary to "maintain the status quo until the relinquishment issue is resolved." The following day, over Tammy's objection, the

---

[2] Loren claimed he was aware of Tammy's pregnancy but his efforts to contact her were "unsuccessful." Tammy claimed Loren failed to return her phone calls. Eventually, she spoke with him in April 2003, and told him she was pregnant. Loren promised to "fight" for the child, but Tammy did not hear from him again before the birth.

[3] Unaware Loren had responded with a petition to establish a parental relationship, NCA requested, and the court issued, an order dispensing with the necessity of filing a petition to determine Loren's rights, terminated his parental rights, and determined the adoption could proceed without his consent. Counsel stipulated to vacate that order in February 2004.

[4] The court later determined Loren should regain the opportunity to establish parental rights because he dismissed his petition to establish paternity in exchange for the postadoption contact agreement, but this adoption fell through when the M.'s separated and abandoned their plans to jointly adopt.

court granted temporary letters of guardianship, expiring November 22, 2004, and ordered weekly 45-minute supervised visits for Tammy at NCA's offices. The court set a "rehearing" for November 22, 2004, and ordered a guardianship investigation under Probate Code section 1513.[5]

On November 2, NCA consented to Tammy's rescission of the relinquishment. In reaching this conclusion, NCA referred to the recent change in circumstances, including: Tammy's clearly stated intention to have Michael raised in a two-parent/income household and no exposure to drug use; the pending dissolution of the M.'s marriage, apparently prompted by the husband's drug use; Tammy's demonstrated parental skills, and her ability to now provide a two-parent home for Michael because of her marriage seven months earlier to Jeff J. Because of the temporary guardianship, NCA informed Tammy it could not return physical custody of Michael and advised her to retain counsel in the guardianship matter.

Represented by counsel, Tammy filed objections to Sheryl's guardianship petition in advance of the November 22 rehearing. She claimed she selected the M.'s based on representations they could provide Michael stability and financial security. She was also misled to believe the adoption would be "open" so that she and Michael's siblings could visit him regularly. She immediately rescinded her relinquishment when she learned Sheryl's husband had admitted to drug use, and no longer lived in the home. She formally "object[ed] to the appointment of any Guardian" and demanded an immediate return of her child.

The court extended the temporary guardianship several times, apparently to conclude the previously ordered investigation. On January 11, Tammy's counsel filed a declaration noting the investigating social worker concluded that an appropriate disposition would be to return Michael to his mother. Counsel requested the court terminate the temporary guardianship. He attached an NCA report concerning Tammy's visits with Michael in November

---

[5] Probate Code section 1513 provides for an investigation, report and recommendation concerning the guardianship. Where the proposed guardian is a nonrelative, the county agency designated to investigate potential dependency (i.e., Orange County Social Services Agency (SSA)) must conduct the investigation. The report must include information on the proposed guardian, the proposed ward, the relationship of the proposed ward to the guardian, the anticipated duration of the guardianship, and the plans of both natural parents and the proposed guardian for the stable and permanent home for the child. If the investigation finds that any party to the proposed guardianship alleges the minor's parent is unfit under Welfare and Institutions Code section 300, the case shall be referred to the county agency designated to investigate potential dependencies. (Prob. Code, § 1513, subd. (c).)

2004. The agency found Tammy's behavior "very appropriate," Michael appeared content during two of the visits, but cried during the last one. Because Sheryl ignored requests to stay in a separate office during these visits, NCA requested she leave the property during any future visits.

Sheryl's lawyer disputed NCA's account, claiming each visit had been cut short because of the child's negative reaction to Tammy and that the parties had agreed at a previous hearing the visits would cease. Counsel submitted a letter from the M.'s family therapist that urged the court to reconsider Tammy's visitation with Michael because there was no existing relationship and "to have a child at this stage begin a new relationship with a mothering figure is to potentially disrupt the child's psychological well-being. The baby as a one-year-old is frightened by strangers and perceives the birth mother as a stranger." Michael's pediatrician had a similar opinion and recommended visitation be withheld "until a final decision on the adoption can be made."

In January 2005, Sheryl petitioned to terminate Tammy's parental rights under section 7820 on the grounds of abandonment. Sheryl alleged Tammy had not provided for Michael's support and had rarely visited Michael since his birth, and asserted it would be in Michael's best interests to terminate Tammy's parental rights.

Tammy filed a response to Sheryl's petition. Her opposition included an allegation the M.'s had misrepresented their marital relationship and failed to disclose the husband's background, which included information about his psychological problems, and incidents of domestic violence and arrests during a previous marriage. Tammy asserted it would not be in Michael's best interests to be permanently separated from his mother and two siblings.

In March 2005, probate court services prepared a report concerning the abandonment petition. It contained statements from Sheryl, Tammy, and NCA's adoptions social worker recapitulating most of the information related *ante*. The report referred to SSA's earlier report under Probate Code section 1513 noting SSA's conclusion it would not intervene if the court placed Michael with Tammy. The report recommended the court conduct further proceedings to determine whether the petition should be granted.

On March 22, 2005, Sheryl filed an "amended" adoption petition designating the adoption as "independent," and deleting her earlier references to an

agency adoption through NCA. The family court consolidated the guardianship and adoption cases, directed Sheryl's lawyer to notify Loren of the pending adoption petition (§ 7660), and continued the matter to April 19.

On April 19, Sheryl filed a petition to determine Loren's parental rights (§ 7662), the family court appointed counsel for Michael, extended the temporary guardianship letters to May 24, and continued the matter to that date. The court declined to increase visitation beyond the weekly visits in place.

On May 3, Tammy moved to dismiss Sheryl's adoption petition, and requested expanded custodial time and joint legal and physical custody during a reunification period. Tammy also asserted Sheryl had no standing to file for an independent adoption under section 8802.

On May 24, Sheryl responded to Tammy's motion. Sheryl asserted she had standing because Loren *would be* executing a parent placement agreement. She argued the family court had no jurisdiction to order reunification or to alter the probate court's custody order. She also noted the court had denied a request for increased visitation at the April hearing and therefore the court should not consider the new request.

On May 24, the court granted Tammy's motion to dismiss the adoption petition for lack of standing, concluding Tammy had a right to her child after she rescinded the relinquishment. The court observed the probate court in the guardianship case erred in establishing the temporary guardianship for other than transitional purposes. To ease Michael's adjustment, the court adopted an eight-week schedule proposed by Michael's lawyer that gradually increased time with Tammy. Beginning June 22, Tammy would care for Michael eight hours a day during the week and overnight on Saturdays. The court ordered the guardianship matter returned to the probate department and set a review hearing for June 27.

On June 6, Sheryl filed an appeal from the May 24 order "dismissing her petition to terminate [Tammy's] parental rights . . . and her petition to adopt the minor, and all prior orders." On June 16, this court denied Sheryl's petition for writ of supersedeas and request for immediate stay. This appeal followed.

## II

### DISCUSSION

### A. *Adoption Procedure*

■ Before turning to Sheryl's claims on appeal, we briefly examine the procedure for adoptions. The law of adoptions is exclusively statutory. (*Adoption of McDonald* (1954) 43 Cal.2d 447, 452 [274 P.2d 860].) The Legislature has established three methods for adopting an unmarried minor: (1) an agency adoption (§ 8700 et seq.); (2) an independent adoption (§ 8800 et seq.); and (3) a stepparent adoption (§ 9000).

■ In an agency adoption, the existing parents of the child (the birth parents, see § 8512) relinquish their parental rights to the child to a licensed adoption agency acting as an agent of the state. (See *Scott v. Family Ministries* (1976) 65 Cal.App.3d 492 [135 Cal.Rptr. 430]; §§ 8700, 8518.) A relinquishment of parental rights terminates the birth parents' parental rights and responsibilities and gives exclusive custody and control of the child to the agency pending adoption of the child. (§ 8700, subds. (e) & (j).) The agency is responsible for the care of the child and entitled to exclusive custody and control until the court issues an adoption order. The agency may exercise its discretion and terminate any placement for temporary care or adoption at any time before the court issues an adoption order, and the child must be returned promptly to the physical custody of the agency. (§ 8704, subd. (a).)

■ Typically, the agency conducts a home study and places the child with the prospective adoptive parents for a test period before consenting to the adoption. (§ 8704, subds. (a) & (b); see generally 10 Witkin, Summary of Cal. Law (9th ed. 1989 & 2001 supp.) Parent and Child, § 388.) Only the prospective adoptive parents with whom the child has been placed for adoption may file a petition to adopt. (§ 8704, subd. (b).) After the adoption petition has been filed, the agency may remove the child from the prospective adoptive parents only with the court's approval, upon the agency's motion after notice to the prospective adoptive parents, supported by an affidavit stating the grounds on which removal is sought. (*Ibid.*) If the department or licensed adoption agency refuses to consent to the child's adoption by the person or persons with whom the agency placed the child for adoption, the court may nevertheless order the adoption if it finds that the refusal to consent

is not in the child's best interest. (*Ibid.*) Upon court approval of an agency adoption, the adoptive parents attain all the rights and duties as parents of the child and the birth parents are relieved of all their parental rights and duties. (§§ 8616, 8617.)

■ An independent adoption differs from an agency adoption in that the birth parents agree to relinquish their parental rights directly to the adoptive parents. (§ 8801; see also § 8524.) The birth parents select the prospective adoptive parents and must consent to the adoption by signing an adoption placement agreement; their consent becomes irrevocable after a specified period. (§ 8801.3, subds. (b), (c)(2).) Upon court approval of the independent adoption, the adoptive parents attain all parental rights and duties to the child and the birth parents are relieved of all parental responsibilities. (§§ 8616, 8617.)

■ Section 8700 governs relinquishments to licensed adoption agencies. It provides that in a written statement either birth parent may relinquish a child to a licensed adoption agency for adoption. Subdivision (e) provides the relinquishment is final 10 business days after it is filed with the State Department of Social Services. (See *Adoption of Baby Boy D.* (2001) 93 Cal.App.4th 1, 13 [112 Cal.Rptr.2d 760] [relinquishment form substantially complied with statutory and regulatory requirements].) The birth parent's relinquishment of a child allows the adoption to proceed without further consent of that birth parent. (§ 8606.) A relinquishment that has been filed may be rescinded only with the mutual consent of the licensed adoption agency and the birth parent or parents relinquishing the child. (§ 8700, subd. (e); *Tyler v. Children's Home Society* (1994) 29 Cal.App.4th 511, 528 [35 Cal.Rptr.2d 291].)

■ Section 8700, subdivision (f), further provides that the relinquishing parent may designate in the relinquishment the person or persons with whom the licensed adoption agency must place the child for adoption. Subdivision (g) provides that if the child is not placed in the home of the named person or persons, the agency must notify the birth parent signing the relinquishment within 72 hours of the agency's decision. Per subdivision (h), the relinquishing parent has 30 days to rescind the relinquishment, measured from the date the agency mailed notice of its decision. If the relinquishing parent requests rescission during the 30-day period, the licensed adoption agency must rescind the relinquishment.

By regulation, the agency must arrange the return of the child if the agency agrees to rescind the relinquishment. Return of the child to the parent is required no later than seven working days from the time the decision to rescind is made. (Cal. Code Regs., tit. 22, §§35170, 35155.) Here, NCA agreed to rescind the relinquishment on November 2, 2004. The rescission restored Tammy's parental rights as of that date and, normally, she would have obtained custody of Michael within the week. But just days before NCA transferred custody, Sheryl obtained a temporary guardianship, later petitioned to terminate Tammy's parental rights and attempted to proceed with an independent adoption. We now consider whether the trial court erred in rejecting Sheryl's claims.

## B. *Sheryl's Independent Adoption Petition*

### 1. Persons Not Designated Under Section 8802 Lack Standing to Adopt

Sheryl contends the family court's conclusion she lacked standing contravened the statutory scheme for independent adoptions. Section 8802, the independent adoption provision, specifically lists persons eligible to file an adoption petition. In relevant part, section 8802 provides, "(a)(1) *Any* of the following persons who desire to adopt a child may, for that purpose, file a petition . . . . [¶] . . . [¶] (C) A person with whom a child has been placed for adoption. [¶] (D)(i) A legal guardian who has been the child's legal guardian for more than one year. [¶] (ii) If the court has found the child to have been abandoned pursuant to Section 7822, a legal guardian who has been the child's legal guardian for more than six months. The legal guardian may file a petition pursuant to Section 7822 in the same court and concurrently with a petition under this section."[6] (Italics added.) Sheryl argues this list is not exclusive because "the statute does not state 'only' those enumerated persons may file an adoption provision; it uses the word 'any.'" Consequently, Sheryl concludes the Legislature did not intend to limit adoptions to those persons listed in section 8802. We are not persuaded.

■ When interpreting a statute, we must ascertain the legislative intent so we may "effectuate the purpose of the law." (*Dyna-Med, Inc. v. Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1386 [241 Cal.Rptr. 67,

---

[6] Sheryl has filed an unopposed request for judicial notice of documents from the California Assembly reflecting the legislative history of section 8802, as well as court records included in her petition for writ of supersedeas. The request is granted. (Cal. Rules of Court, rule 22; Evid. Code, § 452.)

743 P.2d 1323].) Our first step is to consider the statutory language, "being careful to give the statute's words their plain, commonsense meaning. [Citation.] If the language of the statute is not ambiguous, the plain meaning controls and resort to extrinsic sources to determine the Legislature's intent is unnecessary." (*Kavanaugh v. West Sonoma County Union High School Dist.* (2003) 29 Cal.4th 911, 919 [129 Cal.Rptr.2d 811, 62 P.3d 54].) If the statutory language is unclear, we may consider the history and background of the measure to discern the Legislature's intent. (*People v. Birkett* (1999) 21 Cal.4th 226, 231–232 [87 Cal.Rptr.2d 205, 980 P.2d 912].) We construe the statute " ' "with reference to the whole system of law of which it is a part so that all may be harmonized and have effect. [Citations.]" ' " (*In re Michael G.* (1988) 44 Cal.3d 283, 296 [243 Cal.Rptr. 224, 747 P.2d 1152].)

■ The plain language of section 8802 supports the family court's interpretation that persons not designated by the statute lack standing to adopt. A commonsense reading of section 8802 reveals the Legislature expressly granted a certain class of persons standing to adopt. It is difficult to imagine the Legislature intended the statute to give the same rights to undesignated persons that it gave to those expressly named. Such an interpretation would make section 8802's specific grant of standing to designated persons redundant. (Cf. *Songstad v. Superior Court* (2001) 93 Cal.App.4th 1202, 1208–1209 [113 Cal.Rptr.2d 729] [statute permitting proponents of an initiative to seek prequalification judicial review shows legislative intent to deny standing to those not designated].) Adopting defendant's interpretation is at odds with the detailed and specific adoption procedures the Legislature designed to resolve parental determinations. If the Legislature intended to grant standing to additional persons, we think it would have done so explicitly.

■ Sheryl asserts the trial court's interpretation failed to harmonize section 8802 with section 7822. This section authorizes any "interested person" to seek a court declaration freeing a minor child from parental control when the parent intends to abandon the child and the child has been left in the care and custody of "another" for a period of six months without any communication or provision for the child's support.[7] (§ 7822.) An interested

---

[7] Section 7822 provides: "(a) A proceeding under this part may be brought where the child has been left without provision for the child's identification by the child's parent or parents or by others or has been left by both parents or the sole parent in the care and custody of another for a period of six months or by one parent in the care and custody of the other parent for a period of one year without any provision for the child's support, or without communication from the parent or parents, with the intent on the part of the parent or parents to abandon the child. [¶] (b) The failure to provide identification, failure to provide support, or failure to communicate is presumptive evidence of the intent to abandon. If the parent or parents have made only token efforts to support or communicate with the child, the court may declare the child abandoned by the parent or parents. [¶] (c) If the child has been left without provision for the child's identification and the whereabouts of the parents are unknown, a petition may be

person is one who has a direct, and not merely consequential, interest in the action—in other words, one who has a real interest in the ultimate adjudication. (§ 7841; *In re Eugene W.* (1972) 29 Cal.App.3d 623 [105 Cal.Rptr. 736].)

Sheryl argues that under section 7822 any person who had the care and custody of a child for six months should receive standing to file an adoption petition: "Indeed the list in . . . section 8802 . . . does not include those persons who traditionally would be persons seeking to adopt a child after that child had been 'abandoned,' i.e. a person with whom a 'child has been left without provision for the child's identification, [etc.]' ([§ 7822, subd. (a)].)." She notes the abandonment statute contemplates cases where the child has been voluntarily surrendered or left in the care and custody of another without agreement or provision for support, which presupposes no guardianship or other formal custody agreement. She asserts under the family court's interpretation, a person who has provided long-term care for a child nevertheless would lack standing to adopt unless that person had obtained a guardianship order: "If the universe of petitioners who may file an adoption petition is restricted to those persons specifically mentioned in 8802, then this would lead to a situation in which a caretaker could file a [section] 7822 abandonment petition, obtain termination of parental rights, but then go no further, i.e. not adopt the child. This is an absurd result . . . ." We do not agree.

There is nothing absurd in requiring the long-term caretaker in Sheryl's hypothetical to proceed with an adoption only after obtaining a guardianship. When a nonrelative seeks a guardianship, the court-ordered investigation must be made by the county agency designated to investigate potential dependency. (Prob. Code, § 1513.) The investigative report must include a discussion of the guardian's social history and relationship to the minor, the minor's social history and an assessment of psychological and educational needs, and the minor's relationship to the guardian. (Prob. Code, § 1513, subd. (a)(1), (2) & (3).) If the guardianship petition states that an adoption petition has been filed, the agency investigating the adoption must file a report with the court on the proposed guardian's suitability. (Prob. Code, § 1543,

filed after the 120th day following the discovery of the child and citation by publication may be commenced. The petition may not be heard until after the 180th day following the discovery of the child. [¶] (d) If the parent has placed the child for adoption and has not refused to give the required consent to adoption, evidence of the adoptive placement shall not in itself preclude the court from finding an intent on the part of that parent to abandon the child. If the parent has placed the child for adoption and has refused to give the required consent to adoption but has not taken reasonable action to obtain custody of the child, evidence of the adoptive placement shall not in itself preclude the court from finding an intent on the part of that parent to abandon the child."

subd. (a).) These procedures are consistent with the Legislature's ordered and detailed adoption procedures and is one manifestly designed to protect the children to be adopted.

At oral argument, Sheryl claimed, albeit equivocally, that in the initial adoption statute the word "only" preceded a list of persons eligible to adopt, but the Legislature subsequently deleted the word "only," and replaced it with the word "any." Sheryl argues this demonstrates an intent to relax limitations on who may adopt. She provides no support for this claim, and our research discloses no prior version of the statute containing the word "only" preceding a list of qualified petitioners. Contrary to Sheryl's assertion, the history of section 8802 and its predecessor reflects a trend toward limiting those who may petition for adoption. (See former Civ. Code, § 224.30, subd. (a) (Stats. 1990, ch. 1363, § 3, p. 6056, eff. July 1, 1990) ["Any person desiring to adopt a child may for that purpose petition the superior court of the county in which the petitioner resides"]; former § 8802 (Stats. 1992, ch. 162, § 10, p. 464, eff. Jan. 1, 1994) [same]; former § 8802, subd. (a) (Stats. 1993, ch. 758, § 9.2, p. 4228, eff. Jan. 1, 1995 ["A grandparent, aunt, uncle, sibling, legal guardian who has been the child's legal guardian for more than three years, person named in the will of a deceased parent as an intended adoptive parent where the child has no other parent, or person with whom a child has been placed for adoption, who desires to adopt a child may, for that purpose, file a petition in the county in which the petitioner resides"]; former § 8802, subd. (a)(1) (Stats. 1996, ch. 510, § 1, p. 2977, eff. Jan. 1, 1995 ["Any of the following persons who desire to adopt a child may, for that purpose, file a petition in the county in which the petitioner resides: [¶] (A) A grandparent, aunt, uncle, first cousin, or sibling. [¶] (B) A person named in the will of a deceased parent as an intended adoptive parent where the child has no other parent. [¶] (C) A person with whom a child has been placed for adoption. [¶] (D) A legal guardian who has been the child's legal guardian for more than one year. However, if the parent nominated the guardian for a purpose other than adoption for a specified time period, or if the guardianship was established pursuant to Section 360 of the Welfare and Institutions Code, the guardian ship shall have been in existence for not less than three years"].) Subsequent revisions have altered the categories slightly but have not deviated from setting forth specific categories of persons who may file a petition for adoption. Nor has the word "only" been added to or removed from the statute. (See Stats. 2000, ch. 937, § 4; Stats. 2002, ch. 1112, § 3; Stats. 2003, ch. 62, § 88; Stats. 2003, ch. 81, § 1; Stats. 2004, ch. 858, § 5.) Thus, to prevail on appeal, Sheryl must show her adoption petition fit within the explicit requirements of section 8802.

### 2. Sheryl Failed to Satisfy Section 8802's Express Requirements for Standing

█ Sheryl contends she qualified as a person with whom the child had been placed for an independent adoption under subdivision (a)(1)(C) of section 8802. But Tammy did not "place" her son with Sheryl. Tammy initially relinquished the child to NCA and later rescinded it when she learned of Sheryl's pending divorce. NCA accepted Tammy's rescission of her relinquishment and Sheryl does not contest the validity of her rescission. Simply put, Tammy did not sign an adoption placement agreement. (§§ 8801.3, 8539.)[8] "The child is not deemed to be placed for adoption with the prospective adoptive parents until the adoption placement agreement has been signed and witnessed." (§ 8801.3, subd. (b)(5).)

Sheryl asserts Loren, Michael's biological father, "subsequently" signed a placement agreement consenting to Sheryl's adoption of the child and therefore she qualifies as a person with whom the child has been placed for adoption. True, Sheryl submitted as an exhibit on her writ petition a purported placement agreement Loren allegedly signed on May 20, 2005. But this document bears no file stamp, and there is nothing in the record to demonstrate Sheryl presented this document to the court or that the parties informed the court the agreement had been signed before the matter was decided. Consequently, Sheryl forfeited this claim.

We also reject Sheryl's argument the guardianship provision of section 8802, subdivision (a)(1)(D) applied to confer standing. Because Sheryl had been temporary guardian for less than one year (October 2004 to May 24, 2005), she did not qualify under subdivision (a)(1)(D)(i) as a person "who has been the child's legal guardian for more than one year." Nor did Sheryl qualify under (D)(ii) because the court made no judicial finding of abandonment under section 7822. And, as we explain *post*, the court's dismissal of the abandonment petition was proper on this record. Consequently, the trial court did not err in rejecting Sheryl's adoption petition because she failed to satisfy any of section 8802's explicit requirements for standing.

█ Finally, Sheryl argues the family court's ruling is at odds with *County of Los Angeles v. Superior Court* (1969) 2 Cal.App.3d 1059 [82 Cal.Rptr. 882].

---

[8] " 'Place for adoption' means, in the case of an independent adoption, the selection of a prospective adoptive parent or parents for a child by the birth parent or parents and the completion of an adoptive placement agreement on a form prescribed by the department by the birth parent or parents placing the child with prospective adoptive parents." (§ 8539.)

The facts in *County of Los Angeles* also concerned an agency adoption and a divorce by the prospective adoptive parents, but present one overriding distinguishing feature. There, the birth mother did not participate in the case because the agency in that case had *not* consented to rescind the relinquishment. As the court noted, once an *agency* adoption petition is filed, the court retains jurisdiction to approve the agency's removal of the child from an adoptive placement and to " '*nevertheless decree the adoption if it finds that the refusal to consent is not in the best interest of the child.*' " (*Id.* at p. 1063.) But once an agency consents to rescission of a relinquishment, as here, the agency adoption petition becomes a nullity because the adoption cannot proceed without the birth parent's consent, as discussed *ante*. This fact undoubtedly prompted Sheryl to amend her petition from an agency adoption to an independent adoption. Nothing in *County of Los Angeles* authorized Sheryl to file for an independent adoption.

## C. *Sheryl's Petition to Free Michael from Parental Control Based on Abandonment*

Sheryl contends the family court erred in dismissing her section 7822 petition as moot because she established a prima facie case of parental abandonment. We disagree. The record incontrovertibly established Tammy did not leave Michael without support or intend to abandon him.

 As noted *ante*, section 7822 provides an interested party may petition to sever parental rights where the child has been left in the custody of another for a period of six months without any provision for the child's support, or without communication from the parent, with the intent to abandon the child. Sheryl argues Tammy abandoned Michael when she placed him for adoption with NCA two days after his birth on November 3, 2003, and did not rescind her relinquishment until September 30, 2004, approximately 10 months later. Sheryl complains she offered visitation to Tammy during the 10 months before relinquishment, but Tammy did not respond. During this period, Tammy had relinquished her legal rights to Michael, Sheryl and her husband had physical custody of the child, and the adoption was proceeding routinely toward its legal conclusion. It is in the interest of all concerned that the birth mother refrain from interfering with the child's relationship with the prospective adoptive parents while the adoption is pending. This is especially true for the child, who is entitled to the stability of a permanent home. We decline to create incentives for the disruption of this process.

Sheryl's other theories also fail to establish a prima facie case of abandonment. Sheryl concedes Tammy rescinded her relinquishment. Tammy continuously objected to the temporary guardianship and visited Michael as often as allowed. Once the court appointed Sheryl temporary guardian, Tammy was not legally entitled to physical custody of the minor without further court order. At this point, Michael's custody status became a matter of judicial decree, not abandonment. (*In re Jacklyn F.* (2003) 114 Cal.App.4th 747, 756 [7 Cal.Rptr.3d 768].)

Sheryl relies on *In re Brittany H.* (1988) 198 Cal.App.3d 533 [243 Cal.Rptr. 763]. *Brittany H.* involved a nonagency placement by the birth mother and a subsequent independent adoption petition. The court held the birth mother's attempt to remove her child from the prospective adoptive parent's home within the six-month period so she could place her with another adoptive couple did not "in and of itself preclude a finding of abandonment." (*Id.* at p. 548.)[9]

Sheryl cites no case involving abandonment following a rescission of relinquishment. As discussed *ante*, once the agency consents to the birth parent's rescission of the relinquishment, *the birth parent's parental rights are restored*, and the agency must return the child within seven working days. If Sheryl were correct, no rescission would be effective more than six months after a relinquishment. We discern no support for that proposition. To the contrary, Tammy satisfied the sole deadline applicable to her by rescinding the relinquishment within 30 days after learning of Sheryl's placement complications. (§ 8700, subd. (h).)

D. *Due Process Claim*

Sheryl contends the dismissal of her petitions to adopt and terminate Tammy's parental rights violated her due process rights to a hearing. She also argues the court violated Michael's liberty interest in maintaining his relationship with Sheryl.

---

[9] Section 7822, subdivision (d), provides, "If the parent has placed the child for adoption and has not refused to give the required consent to adoption, evidence of the adoptive placement shall not in itself preclude the court from finding an intent on the part of that parent to abandon the child. *If the parent has placed the child for adoption and has refused to give the required consent to adoption but has not taken reasonable action to obtain custody of the child, evidence of the adoptive placement shall not in itself preclude the court from finding an intent on the part of that parent to abandon the child.*" (Italics added.) Although this subdivision applies only where the parent directs the adoptive placement, it corroborates our view that a parent who takes reasonable action to obtain custody of the child after grounds for rescission have arisen precludes the court from finding an intent to abandon the child. Nothing in our opinion should be read to suggest abandonment cannot occur during the period a child has been placed for independent adoption.

Sheryl forfeited her due process claims when she failed to object below. The parties engaged in extended discussions urging the court to adopt their interpretations of sections 8802 and 7822, but none of the participants, including minor's counsel representing Michael, requested a hearing on these issues.[10] We assume the parties did not press the issue because there were no material factual disputes, and the disagreement centered on the interpretation of sections 8802 and 7822.

On the merits, Sheryl relies on *Adoption of Baby Girl B.* (1999) 74 Cal.App.4th 43 [87 Cal.Rptr.2d 569], which also involved an independent adoption. There, the local social services agency placed the baby in the prospective adoptive mother's custody. The birth mother subsequently consented to adoption by entering into an adoption placement agreement, the caretaker filed an adoption petition, and the consent to adoption became irrevocable. (§ 8814.5, subd. (a)(1).) The State Department of Social Services visited the caretaker's home, and recommended denial of the adoption petition and removal of the baby. Relying on the independent adoption statutes providing for review of the state's recommendation of removal, the appellate court held the prospective adoptive mother was *statutorily entitled* to an evidentiary hearing *because the court could grant an adoption petition without the department's consent.* (§§ 8612, 8613, 8822, 8823.)

Again, in an agency adoption, the agency must return the child to the birth parent if it accepts the rescission of the relinquishment. The court may not grant adoption without the birth parent's consent. As such, Sheryl lacked standing, in contrast to the prospective adoptive parent in *Adoption of Baby Girl B.* Whatever the extent of Sheryl's liberty interest, her interest was conditioned by the laws which gave rise to it. The agency adoption laws provide for the return of a child to the birth parent immediately after the agency accepts the rescission. Sheryl raised no factual issues casting doubt on Tammy's rescission or NCA's acceptance. In sum, the unequivocal nature of the rescission and acceptance mooted the need for an evidentiary hearing on the adoption and termination petitions. An evidentiary hearing therefore would have been a useless gesture.

E. *Child Custody Order*

Sheryl complains the family court had no jurisdiction to alter the probate court's existing custody orders issued when it established Sheryl's temporary guardianship over Michael. She argues only the probate court has jurisdiction to make custody determinations concerning the guardianship; therefore, we must overturn the family court's order changing Michael's custody. She also

---

[10] Sheryl did request a hearing on whether the court should terminate the guardianship.

claims the family court exceeded its jurisdiction when it concluded the probate court erred in issuing the temporary guardianship.

Sheryl is correct that probate courts have exclusive jurisdiction over guardianships (Prob. Code, § 17000), but the family court had jurisdiction to act here for two reasons. First, the court had subject matter jurisdiction because "a nonprobate department *does not* lack fundamental jurisdiction over a probate matter." (*Harnedy v. Whitty* (2003) 110 Cal.App.4th 1333, 1344 [2 Cal.Rptr.3d 798].) As *Harnedy* explains, "the sort of jurisdiction provided by this section [Prob. Code, § 17000] is not the sort of fundamental jurisdiction, i.e., implicating the competency or inherent authority of the court, the lack of which would render a judgment void." (*Id.* at p. 1345.) A family court issuing orders affecting matters within the probate court's exclusive jurisdiction acts only " 'in excess of jurisdiction,' " but does so having subject matter jurisdiction. (*Id.* at p. 1343.) "[A]n act in excess of jurisdiction is valid until set aside, and parties may be precluded from setting it aside by such things as waiver, estoppel or the passage of time." (*People v. Ruiz* (1990) 217 Cal.App.3d 574, 584 [265 Cal.Rptr. 886].) Consequently, a party failing to raise the issue below "is barred by principles of waiver [citation] and estoppel . . . ." (*Harnedy,* at p. 1345.)

In the proceedings below, Sheryl complained the family court's transfer of custody "puts cart before the horse," and "guts my guardianship case." But other than this general complaint, she failed to object the court was acting in excess of its jurisdiction. Thus, she is barred by principles of waiver and estoppel.

Secondly, on the merits, Sheryl fares no better. On March 22, 2005, the family court consolidated the adoption and guardianship cases with Sheryl's counsel's agreement. On April 19, the family court extended the letters on the temporary guardianship to May 24. On May 3, Tammy noticed a motion with the family court to modify custody and visitation. Sheryl's letters of temporary guardianship expired on May 24, the same date the family court made its transitional order in the consolidated cases. Thus, the custody order transitioning Michael did not run afoul of any existing probate court order. The family court's opinion about the temporary guardianship aside, it did not purport to overrule the order establishing it. In any event, with the lapse of the temporary guardianship, the probate court's jurisdiction also lapsed. And notwithstanding dismissal of the independent adoption petition, the court may retain jurisdiction over the child for the purposes of making any order for the child's custody that the court deems to be in the child's best interest. (§ 8804, subd. (b).)

III

The trial court's order dismissing Sheryl's petitions to free Michael from Tammy's parental custody and control and to independently adopt him is affirmed.

Sills, P. J., and Bedsworth, J., concurred.

A petition for a rehearing was denied March 30, 2006, and the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied May 24, 2006, S142399.