Filed 1/26/17

# CERTIFIED FOR PUBLICATION

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### SECOND APPELLATE DISTRICT

### DIVISION ONE

| | |
|---|---|
| C.M., | B270525 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BF054159) |
| v. | |
| M.C., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County.  Amy Pellman, Judge.  Affirmed.

Buchalter Nemer, Michael W. Caspino, Robert M. Dato; The Cassidy Law Firm, and Harold J. Cassidy for Defendant and Appellant.

John L. Dodd & Associates, John L. Dodd, Benjamin Ekenes; Jarrette & Walmsley and Robert R. Walmsley for Plaintiff and Respondent.

_____

Defendant and appellant M.C. (M.C.) appeals from a judgment declaring plaintiff and respondent C.M. (Father) to be the sole legal parent of triplet children (the Children) and finding that M.C. has no parental rights. M.C. was the gestational carrier for the Children, who were conceived in vitro using Father's sperm and ova from an anonymous donor. Father and M.C. entered into the surrogacy arrangement pursuant to a written "In Vitro Fertilization Surrogacy Agreement" in 2015 (the Agreement). Each party was represented by separate counsel in negotiating the Agreement.

Despite the Agreement, during the pregnancy M.C. developed reservations about the arrangement. She sought rights as the Children's mother and custody of at least one of the Children. When Father filed a petition pursuant to Family Code section 7962 to be declared the sole parent of the Children, M.C. opposed the petition.[1] Following a hearing on the petition on February 9, 2016, the trial court entered judgment in favor of Father.

On appeal, M.C. raises various substantive and procedural challenges to the judgment. The challenges amount to an all-out attack on the constitutionality and enforceability of surrogacy agreements in California.

We conclude that M.C.'s arguments are foreclosed by specific legislative provisions and by a prior decision by our Supreme Court. In view of the well-established law in this area, our role on appeal is limited to reviewing whether the legislative requirements for establishing an enforceable surrogacy

---

[1] Subsequent undesignated statutory references are to the Family Code.

2

agreement were met in this case.  We find no error in the trial court's ruling on that issue, and we therefore affirm.

**BACKGROUND**

**1.    The Agreement**

M.C. executed the 75-page Agreement on May 31, 2015; Father executed the agreement on June 3, 2015.  The Agreement identified Father as the "Intended Parent" and M.C. as "Surrogate."

M.C. was 47 years old at the time she entered into the Agreement.  She represented in the Agreement that she has four children of "childcare age," and that she "has previously been a surrogate mother and is familiar with the undertaking."  She stated that she did "not desire to have a parental relationship" with any children born pursuant to the surrogacy arrangement and that she "believes any Child conceived and born pursuant to this Agreement is/are morally, ethically, contractually and legally that of Intended Parent."  The Agreement stated that the underlying intent of all parties to the Agreement was that "any Child conceived and/or born pursuant to the conduct contemplated under this Agreement shall be treated, in all respects, as the sole and exclusive natural, biological and/or legal Child of Intended Parent.  It is also the intent of all Parties to this Agreement that Surrogate and her Partner shall not be treated as a natural, biological and/or legal parent of any Child conceived and/or born pursuant to the conduct contemplated under this Agreement."

The Agreement stated that the parties were "informed and advised of the California Supreme Court decision in *Johnson v. Calvert*, and the Court of Appeal decision in *In re Marriage of Buzzanca*, and agree that these decisions apply to and govern

3

this Agreement and the conduct contemplated thereby.[2] Specifically, each Party agrees that the intent to bear and raise the Child conceived and born pursuant to this Agreement shall be determinative of Parentage, to wit:  that Intended Parent shall be treated as the legal, natural, and biological parent of any Child(ren) conceived and born pursuant to this Agreement."  The parties further acknowledged that sections 7960 and 7962 "apply to this Agreement," and represented that "in entering into this Agreement they have taken steps to execute this Agreement in compliance with sections 7960 (as amended) and 7962."

The Agreement contained a disclosure that the "ova/eggs were provided by an anonymous donor," and that the embryos "will be created through the use of sperm provided by Intended Parent with ova/eggs anonymously donated to Intended Parent for his exclusive use."  The parties agreed that "the donated ova/eggs shall be deemed as being the property of Intended Parent and as having come from Intended Parent."

In addition to describing the compensation that M.C. was to receive for her "discomfort, pain, suffering and for pre-birth child support," the Agreement addressed medical costs.  It provided that medical expenses would be paid through a combination of "Surrogate's insurance and Intended Parent's direct payment for such uncovered costs."

M.C. promised in the Agreement that she would "freely and readily assist Intended Parent in legalizing his parent-child relationship with the Child."  The parties stated their understanding that, "based upon the current law in the State of

---

[2] *Johnson v. Calvert* (1993) 5 Cal.4th 84 (*Calvert*); *In re Marriage of Buzzanca* (1998) 61 Cal.App.4th 1410 (*Buzzanca*) (discussed *post*).

4

California, an action to terminate the Parental rights of Surrogate is not necessary and Intended Parent is entitled to a judicial determination of his Parentage, notwithstanding any objection to the contrary by Surrogate."

M.C. was represented by separate counsel, Lesa Slaughter, in negotiating the Agreement. Father agreed to pay the costs of M.C.'s counsel up to an amount of $1,000 for legal advice with respect to the Agreement and up to $500 for review and advice with respect to the legal documents "necessary to establish the Intended Parent's parentage." The Agreement contained a disclosure and waiver of the potential conflict of interest from Father's payment of M.C.'s legal counsel fees.

M.C. initialed each page of the Agreement, and her signature was notarized. Attorney Slaughter transmitted the executed and notarized Agreement to Father's counsel with a transmittal letter dated May 31, 2015. The letter stated that Slaughter had "independently represented [M.C.] and my consultation and review with her is now complete." She reported that her consultations with M.C. and M.C.'s signature to the Agreement "prove to me that my client has a clear and informed understanding of the nature of the Gestational Surrogacy Contract and agrees to be fully bound by its terms." Slaughter provided her "full legal clearance to proceed with medication in this matter."

## 2.    Proceedings To Determine Parentage

An embryo transfer took place on August 17, 2015. A subsequent pregnancy test confirmed a pregnancy, and an ultrasound on September 8, 2015, revealed that M.C. was carrying triplets.

5

On January 16, 2016, before the Children were born, Father filed a "Verified Petition to Declare Existence of Parent-Child Relationship Between the Children to be Born and Petitioner, and Non-existence of Parent-Child Relationship Between the Children to be Born and Respondent/Surrogate" (Petition). The Petition was supported by declarations from Father, Father's counsel, and a doctor who was responsible for the embryo creation and transfer procedure. Father also lodged a copy of the Agreement and filed a memorandum of points and authorities in support of the Petition (Memorandum).

Father's submission did not include a declaration from M.C. or her counsel. The Memorandum stated that "[i]n conjunction with the Petition it was anticipated Respondent, [M.C.], would comply with the [In Vitro Fertilization Surrogacy] Agreement and provide her Declaration in support of the Petition and a Stipulation admitting that she was not the parent of the Children at issue and did not wish to have a parental relationship with the Children. At this time that may not be."

A hearing on the Petition was noticed for February 9, 2016. On February 1, 2016, M.C. filed a 65-page verified answer and counterclaim responding to Father's Petition. The answer and counterclaim sought a range of relief, including that: (1) M.C. be declared "the legal parent and mother" of the Children; (2) Father be declared "not the sole parent" of the Children and "not entitled to the benefits" of section 7962; (3) Mother be awarded sole custody of one of the Children, and a custody trial be scheduled to determine "what custody arrangement will be in the best interests" of the other two Children; (4) a declaration that section 7962 violates the due process and equal protection rights of the Children and of M.C.; (5) a declaration that the Agreement

6

cannot form the basis for terminating the parental rights of M.C.; and (6) an order that Father submit to DNA testing to determine whether he is the genetic father of the Children.

The counterclaim described a series of e-mail communications from Father in which he allegedly sought to abort at least one of the fetuses, first for financial reasons and then out of an allegedly pretextual concern for the health of the children. M.C. refused to abort any of the fetuses, stating that she is "pro-life." She offered to raise one of the Children.

The counterclaim also alleged that Father was single, 50 years old, deaf, employed as a postal worker in Georgia, and responsible for caring for his elderly parents, with whom he lives. M.C. alleged that Father is "not capable of raising three children by his own admission, and may not be capable of raising even one or two children." M.C. claimed that she learned for the first time while pregnant that the organization that facilitated the surrogacy arrangement had never done a "home study" to determine whether Father "is capable of raising any children."

After filing the counterclaim, M.C. moved ex parte on February 4, 2016, to continue the date for the hearing on the Petition, requesting a schedule for discovery concerning Father's willingness and ability to raise the Children. The ex parte application recited many of the same factual allegations concerning M.C.'s communications with Father that were included in M.C.'s counterclaim.

The trial court heard the ex parte application on February 8, 2016. The court denied the application, finding that M.C. had been aware of the Petition for a month and the ex parte proceeding was therefore not justified. The court also summarized the content and the circumstances of the Agreement

7

and the Petition, referred to the decisions in *Calvert* and *Buzzanca* and the requirements of section 7962, and observed that Father "has complied with these requirements other than submitting the declaration of [M.C.] and her attorney."  Father's counsel indicated that he might have to call M.C.'s former counsel, Slaughter, to testify in lieu of a declaration.

The hearing on Father's Petition took place on February 9, 2016.  Father's counsel explained that he had not been able to obtain a declaration from Slaughter because she had previously represented M.C.  However, Father had served her with a subpoena and she was present in court.  The court permitted her to testify.

Slaughter testified that she had "probably represented over a thousand surrogates."  She previously represented M.C. with respect to two surrogacy arrangements, including the Agreement with Father.  M.C. initially waived the attorney-client privilege to permit Slaughter to testify about her representation, but then revoked the waiver when Father's counsel began to question Slaughter concerning the first surrogacy arrangement.  Over objections, the court permitted Slaughter to authenticate her May 31, 2015 transmittal letter, and to testify that the contents were "true and correct."  Slaughter also testified that it was her standard practice to review surrogacy contracts with her clients thoroughly and to discuss any questions they might have.  When asked if she had employed her standard practice with M.C., Slaughter responded that she has "not varied my practice regarding surrogates or intended parents or egg donors, for that matter, whenever I undertake representation."

On cross-examination, Slaughter testified that she had about 15 telephone conversations with M.C. concerning the

8

surrogacy arrangement with Father, including revisions to the Agreement. She testified that she "withdrew my representation when . . . it became obvious [M.C.] was not following my legal advice." Over objection, the trial court admitted the May 31, 2015 transmittal letter as an exhibit.

Prior to ruling on the Petition, the trial court also questioned M.C. under oath. In response to the court's questions, M.C. confirmed that she had signed the Agreement and initialed each page.

## 3. The Trial Court's Ruling

The court found that Father "substantially complied" with section 7962, "the holding of the Supreme Court in *Johnson v. Calvert*, and the holding of" *Buzzanca*. Specifically, the court found that M.C. "read and reviewed every page of the gestational agreement"; that she initialed and signed the Agreement"; that "her agreement was voluntary"; and that "all the other provisions of 7962 have been satisfied." The court entered a detailed judgment establishing that Father is the sole parent of the Children.

With respect to M.C.'s counterclaim, the trial court initially observed that it appeared to be "procedurally improper," and that the court did not believe that "counsel is even entitled to counterclaim." However, the court declined to strike the counterclaim. The court concluded that the documents M.C. submitted in support of the counterclaim were, "essentially, challenges to the petition." The court denied the counterclaim on the merits "even if it were proper."

M.C. filed her notice of appeal on February 23, 2016.[3]

_____

[3] M.C. also filed a petition for a writ of supersedeas, which this court denied on April 14, 2016. In addition to these

9

## DISCUSSION

Section 7962 establishes a procedure for a summary determination of parental rights when specific requirements for an enforceable surrogacy agreement are met. The section requires that an "assisted reproduction agreement for gestational carriers" contain: (1) the date on which the agreement was executed; (2) the identity of the persons "from which the gametes originated, unless anonymously donated"; (3) the identity of the "intended parent or parents"; and (4) disclosure of how the "intended parents" will "cover the medical expenses of the gestational carrier and of the newborn or newborns." (§ 7962, subd. (a)(1)–(4).) The section also requires that the surrogate and the intended parent be represented by separate counsel with respect to the agreement; that the agreement be executed and notarized; and that the parties begin embryo transfer procedures only after the agreement has been fully executed. (§ 7962, subds. (b)–(d).)

An action to "establish the parent-child relationship between the intended parent or parents" and the child conceived pursuant to an assisted reproduction agreement may be filed before the child's birth. The parties are to "attest, under penalty of perjury, and to the best of their knowledge and belief," as to their compliance with section 7962 in entering into their agreement. (§ 7962, subd. (e).) A notarized agreement signed by

proceedings in state court, M.C. filed an action on February 2, 2016, in federal court, asserting various alleged constitutional violations. (See *Cook v. Harding* (C.D. Cal. 2016) 2016 U.S. Dist. LEXIS 73466 at pp. *18–*20 (*Harding*).) The federal court dismissed that action on June 6, 2016, on abstention grounds. (*Id.* at p. *39.)

10

all parties "with the attached declarations of independent attorneys" lodged with the court in accordance with section 7962 "shall rebut any presumptions" of parenthood contained in various specified code sections.  (§ 7962, subd. (f)(1).)

Section 7962 also provides that, on petition by any party to a properly executed agreement, the court shall issue a judgment or order establishing "the parent-child relationship of the intended parent or intended parents identified in the surrogacy agreement," subject to proof of compliance with the section. (§ 7962, subd. (f)(2).)  That judgment shall also establish that "the surrogate, her spouse, or partner is not a parent of, and has no parental rights or duties with respect to, the child or children." (*Ibid.*)  The judgment "shall terminate any parental rights of the surrogate and her spouse or partner without further hearing or evidence, unless the court or a party to the assisted reproduction agreement for gestational carriers has a good faith, reasonable belief that the assisted reproduction agreement for gestational carriers or attorney declarations were not executed in accordance with this section."  (*Ibid.*)

In light of these well-defined criteria and procedures and despite the range of M.C.'s arguments, there are ultimately only two questions that determine the outcome of this appeal.  First, did Father comply with the requirements for establishing a parent-child relationship and for terminating M.C.'s claimed parental rights under section 7962?  Second, was the trial court's application of section 7962 here consistent with the constitutional rights of M.C. and the Children?  We conclude that the answer to both questions is yes.

11

### 1.    Standard of Review

Neither party addresses the appropriate standard of review to apply to M.C.'s challenges to the judgment.  We employ well-accepted principles in reviewing M.C.'s various arguments.  Most of M.C.'s arguments focus on the interpretation and constitutionality of statutes, which we review under a de novo standard.  (See *Herbst v. Swan* (2002) 102 Cal.App.4th 813, 816 [constitutionality of statute]; *In re D.S.* (2012) 207 Cal.App.4th 1088, 1097 [statutory interpretation].)  To the extent that M.C.'s arguments involve a challenge to the trial court's findings of fact relevant to M.C.'s claimed parental rights, we apply the substantial evidence standard.  (*Adoption of Arthur M.* (2007) 149 Cal.App.4th 704, 717 [applying substantial evidence standard to factual findings concerning biological father's right to object to adoption].)

### 2.    M.C. Is Not Estopped From Challenging the Legal Effect or Validity of the Agreement

Before reaching the merits of M.C.'s arguments, we consider Father's claim that M.C. is estopped from making those arguments by the terms of the Agreement.  Father argues that M.C. is precluded from claiming that she has any parental rights concerning the Children because she promised in the Agreement that she would not assert any such rights.  In support, Father cites cases holding that parties can be estopped from seeking an unfair benefit by manipulating or taking inconsistent positions in judicial proceedings.

The principle involved in those cases does not apply here. Those cases focus on the need to protect the integrity of judicial

proceedings.[4] The conduct that Father argues should result in estoppel here was not a position taken in a judicial proceeding but rather commitments made in a written agreement before the Children had been conceived and before any judicial action had been initiated. What Father seeks is not estoppel, but rather enforcement of the Agreement. Father asks us to find the promises that M.C. made in the Agreement enforceable on their own terms, before even considering whether such summary enforcement is appropriate here under the governing statute and the constitutional arguments that M.C. has made.

We decline that approach. M.C.'s arguments challenge the proper interpretation and validity of the Agreement. Whatever the merits of those arguments, the doctrine of estoppel does not provide a ground to ignore them. We will not require

---

[4] In *In re Griffin* (1967) 67 Cal.2d 343, the court held that a defendant accused of a probation violation could not obtain dismissal as a result of his conduct in requesting a continuance that extended beyond the period of his probation. A contrary rule would " 'permit the parties to trifle with the courts.' " (*Id.* at p. 348, quoting *City of Los Angeles v. Cole* (1946) 28 Cal.2d 509, 515.) *In re Marriage of Hinman* (1992) 6 Cal.App.4th 711, 716, held that a wife could not challenge a judgment in a dissolution action awarding joint custody of her two children from a prior marriage where she stipulated to the judgment. Similarly, in *Kristine H. v. Lisa R.* (2005) 37 Cal.4th 156, one lesbian partner was estopped from arguing that her estranged partner was not the parent of their child when she had previously stipulated to a judgment declaring them both the " 'joint intended legal parents.' " (*Id.* at p. 161.) Again, the court was concerned that a contrary result would " ' " 'trifle with the courts.' " ' " (*Id.* at p. 166, quoting *Adoption of Matthew B.* (1991) 232 Cal.App.3d 1239, 1269.)

13

enforcement of the Agreement without first considering whether it is enforceable.  (Cf. *In re Marriage of Moschetta* (1994) 25 Cal.App.4th 1218, 1235 [there is "no doubt that enforcement of a surrogacy contract prior to a child's birth presents a host of thorny legal problems"]; *Buzzanca*, *supra*, 61 Cal.App.4th at p. 1422 ["There is a difference between a court's *enforcing* a surrogacy agreement and making a legal determination based on the intent *expressed* in a surrogacy agreement"].)  We therefore reach the merits of M.C.'s appeal.

3. **The Trial Court Correctly Ruled That the Agreement Substantially Complied With the Requirements of Section 7962**

The Agreement contained all the information required by section 7962.  It included:  (1) the dates it was executed; (2) the source of the gametes to be used for the embryos (Father and an anonymous egg donor); (3) the identity of the intended parent (Father); and (4) disclosure of how medical expenses would be covered.  (§ 7962, subd. (a).)  Father and M.C. were represented by separate counsel in negotiating the Agreement.  (§ 7962, subd. (b).)  The parties' signatures were notarized.  (§ 7962, subd. (c).)  And M.C. did not undergo an embryo transfer procedure or begin medication to prepare for such a procedure until after the Agreement had been executed.  (§ 7962, subd. (d).)

Father also substantially complied with the procedural requirements under section 7962 for summary determination of parentage pursuant to the Agreement.  Father lodged a copy of the Agreement.  (§ 7962, subd. (e).)  Because M.C. opposed the petition to declare Father the sole parent, she did not provide a declaration attesting under penalty of perjury that the parties complied with section 7962 in entering into the Agreement.

14

(*Ibid.*)  However, she signed the Agreement itself under penalty of perjury, affirming that the contents of the Agreement were "true and correct except as to those matters which are based on upon information and belief, and as to those matters, we believe them to be true."  The Agreement states that sections 7960 and 7962 "apply to this Agreement," and that the parties "are also informed and hereby represent that they have taken active steps to execute this Agreement in compliance with Sections 7960 (as amended) and 7962."  M.C. also confirmed under oath at the hearing on the Petition that she had signed the Agreement and initialed each page.

Father also did not provide a declaration from M.C.'s lawyer for the Agreement, Slaughter, as required under section 7962, subdivision (f)(1) to rebut various statutory presumptions concerning parenthood.  However, Father explained to the trial court that Slaughter was not in a position to provide such a declaration supporting the Petition in light of her prior representation of M.C., and he subpoenaed Slaughter to testify at the hearing on the Petition.  At the hearing, Father elicited testimony from Slaughter showing that she had provided M.C. with independent representation with respect to the Agreement; that M.C. had a "clear and informed understanding of the nature of the [Agreement];" and that she had entered into the Agreement "freely and voluntarily" and had agreed to be "fully bound by its terms."[5]

---

[5] In her opening brief, M.C. states that she contended below that she "did not receive independent legal advice concerning the contract."  It is unclear whether she intended to raise this claim on appeal.  If so, she has forfeited the claim, as she has not provided any argument or citations to authority or to

15

Under these facts, Father substantially complied with each requirement in section 7962 to obtain the orders concerning parenthood authorized by that section. The Agreement itself contained M.C.'s affirmation under oath that she intended to comply with section 7962 in entering into the Agreement. And Slaughter's testimony under oath was the functional equivalent of a declaration. Indeed, it was arguably a better procedural vehicle for testimony about M.C.'s capacity and intent, as it provided an opportunity for cross-examination.

In the analogous area of consent to adoption, courts have concluded that substantial compliance with regulatory requirements is sufficient to provide enforceable consent, so long as the purpose of the requirements is met. (See *Tyler v. Children's Home Society* (1994) 29 Cal.App.4th 511, 540 [partial noncompliance with details of regulations for providing consent to adoption did not vitiate consent where the "purpose of assuring voluntary and knowing decisionmaking by the parents" was fulfilled]; *Adoption of Baby Boy D.* (2001) 93 Cal.App.4th 1, 12–13 [evidence showed that birth mother "substantially complied with every reasonable objective of the statute and regulations" despite inadvertent failure to check one of the boxes on a consent form].) Similarly, the evident purpose of the detailed requirements in section 7962 is to ensure that the parties to an assisted reproduction agreement enter into the agreement knowingly and voluntarily. Where, as here, there is substantial compliance with

_____

the record in support. (*People v. Stanley* (1995) 10 Cal.4th 764, 793.) We therefore need not consider whether her argument about the adequacy of the legal counsel she received was relevant to the requirements of section 7962 and, if so, whether the trial court erred in rejecting her argument below.

16

section 7962's requirements showing that the parties' agreement was knowing and voluntary, the purpose of the statute is met.

Despite the evidence that the Agreement complied with the requirements of section 7962, M.C. argues that it could not provide the basis to establish Father's parenthood under that section for several reasons. First, M.C. claims that, even if all the requirements of section 7962 are met, that is not sufficient to rebut the presumption of parenthood that is established by giving birth. Section 7610, subdivision (a) provides that "[b]etween a child and the natural parent," a parent and child relationship "may be established by proof of having given birth to the child." M.C. correctly points out that this subdivision is not included in the list of presumptions that are rebutted by lodging a notarized assisted reproduction agreement "with the attached declarations of independent attorneys" under section 7962, subdivision (f)(1).[6]

Neither the text nor the legislative history of section 7962 provides any indication of why the evidence of parenthood recognized under section 7610, subdivision (a) was omitted from the list of rebutted presumptions under section 7962, subdivision

---

[6] Subdivision (f)(1) of section 7962 states that lodging an executed and notarized agreement and attorney declarations "shall rebut any presumptions contained within Part 2 (commencing with Section 7540), *subdivision (b) of Section 7610*, and Sections 7611 and 7613, as to the gestational carrier surrogate, her spouse, or partner being a parent of the child or children." (Italics added.) Thus, the list of rebutted presumptions includes only subdivision (b) of section 7610, which concerns establishing a parent and child relationship between a child and "an adoptive parent."

(f)(1).**7**  Indeed, its omission seems inconsistent with the purpose of the provision.  A claim that a gestational carrier is the "birth mother" is the argument one would most likely expect a surrogate to make to establish a parent and child relationship. In summarizing the bill that became section 7962, the Assembly Committee on the Judiciary explained that "if a woman undergoes in vitro fertilization, under a physician's supervision, using eggs donated on behalf of intended parent or parents and the woman agrees to that in a writing signed by the woman and the intended parents prior to creation of the embryo, then the woman is not treated as the natural parent of the child and the intended parents are presumed to be the child's natural parents." (Assem. Com. on Judiciary, Analysis of Assem. Bill No. 1217 (2011–2012 Reg. Sess.) as amended April 26, 2016, at pp. 1–2 (Assembly Analysis).)  Similarly, an analysis by the Senate Judiciary Committee explained that the bill would provide that "any agreement that is executed in accordance with the

---

**7** Father suggests that section 7962, subdivision (f)(1) does not mention section 7610, subdivision (a) because that subdivision does not actually create a presumption.  The basis for this argument is unclear.  The subdivision states that giving birth to a child may establish a parent child relationship. Moreover, our Supreme Court in *Calvert* characterized section 7610, subdivision (a)'s predecessor statute (former Civil Code section 7003) as establishing a presumption of motherhood, and rejected the argument that the statute could not apply to a gestational carrier who is not genetically related to the child. (See *Calvert, supra*, 5 Cal.4th at pp. 92–93 & fn. 9.)  Father also does not explain why, if section 7610 does not contain any presumptions, section 7610, subdivision (b) would be included in the list of rebutted presumptions under section 7962, subdivision (f)(1).

18

provisions of the bill is presumptively valid and shall rebut any presumptions that the surrogate, and her spouse or partner, are the parents of the child." (Sen. Com. on Judiciary, Analysis of Assem. Bill No. 1217 (2011–2012 Reg. Sess.) as amended June 11, 2012, at p. 4 (Senate Analysis).)

We need not attempt to resolve this apparent discrepancy. Whether or not section 7962, subdivision (f)(1) rebuts a presumption of parenthood based upon giving birth, the subsequent subpart of subdivision (f) makes clear that a surrogate has no parental rights when an assisted reproduction agreement complies with the requirements of the section.

Section 7962, subdivision (f)(2) states that, in ruling on a petition, "[s]ubject to proof of compliance with this section, the judgment or order shall establish the parent-child relationship of the intended parent or intended parents identified in the surrogacy agreement and shall establish that the surrogate, her spouse, or partner is not a parent of, and has no parental rights or duties with respect to, the child or children." This directive is quite clear. Compliance with the requirements of an assisted reproduction agreement and submitting the proof identified in section 7962 is all that is necessary to establish a parent-child relationship for the intended parent or parents and to extinguish any claim of parenthood by the surrogate.

M.C. argues that this subdivision does not support the trial court's order here because Father's alleged conduct in requesting an abortion of one fetus and allegedly threatening to surrender one of the Children through adoption showed that he did not "intend" to be a parent. Whatever its merits, the argument is foreclosed by the language of the subdivision, which provides that the "intended parent or intended parents *identified in the*

19

*surrogacy agreement*" are to be declared the sole parents of children born to a surrogate. (§ 7962, subd. (f)(2), italics added.) There is no doubt here that Father was the intended parent identified in the Agreement.

The conclusion that Father is the intended parent for purposes of section 7962 is also supported by the definition of " '[i]ntended parent' " in section 7960, subdivision (c). That provision identifies an "intended parent" as an individual "who manifests the intent to be legally bound as the parent of a child resulting from assisted reproduction." The Agreement clearly assigns that responsibility to Father.

Apart from these explicit statutory provisions, M.C.'s argument is inconsistent with the apparent purpose of section 7962 to provide a certain and reliable procedure to determine the parent-child relationship *before* the parties enter into a surrogacy agreement. (See Senate Analysis, *supra*, at p. 7 [as a result of the bill enacting section 7962, "intended parents, surrogates, and courts would arguably have a clear procedure to follow in creating and enforcing surrogacy agreements and determining parental rights"].) Permitting a surrogate to change her mind about whether the intended parent would be a suitable parent— or requiring a court to rule on whether the intended parent's conduct subsequent to executing an assisted reproduction agreement is appropriate for a prospective parent—would undermine the predictability of surrogacy arrangements. We agree with the observation of the federal court in *Harding*, *supra*, that, were M.C.'s position to be accepted, we are "at a loss to imagine an intended parent in this state who would contract with a gestational surrogate, knowing that the woman could, at her whim, 'decide' that the intended parent or parents are not up to

20

snuff and challenge their parenting abilities in court." (*Harding*, *supra*, 2016 U.S. Dist. LEXIS 73466 at p. *23.)

**4. M.C.'s Constitutional Challenges Fail**

M.C. makes various constitutional arguments challenging the procedure for establishing a parent-child relationship under section 7962 and the legitimacy of surrogacy arrangements generally. It is important to note at the outset that our Supreme Court has already rejected constitutional challenges to surrogacy agreements and ruled that such agreements are consistent with the public policy of California. (See *Calvert*, *supra*, 5 Cal.4th at pp. 95, 98–100.) Indeed, the Legislature's stated intent in enacting section 7962 was to codify the decisions in *Calvert* and *Buzzanca*, *supra*, 61 Cal.App.4th 1410. (See Assembly Analysis, *supra*, at p. 2 ["Case law in California makes clear that the intended parents are the natural parents and this bill clarifies and codifies that case law"]; Senate Analysis, *supra*, at p. 4 ["California case law establishes that even without a genetic link, the parties who intended to bring a child into the world are the child's legal parents [citing *Calvert* and *Buzzanca*]. This bill, with respect to surrogacy agreements, seeks to codify and clarify that case law by requiring parties to enter into surrogacy agreements, as specified, prior to the commencement of any medical treatment related to the surrogacy arrangement"].)

In *Calvert*, the court considered competing claims of parental rights by a surrogate and a husband and wife who contracted with the surrogate to give birth to a child for them. The child was conceived with sperm from the husband and an egg from the wife. The parties executed a contract providing that the child would be taken into the couple's home as "their child," and that the surrogate would relinquish "all parental rights." The

21

relationship between the parties deteriorated before the child was born, leading to competing lawsuits seeking a declaration of parental rights. (*Calvert, supra*, 5 Cal.4th at pp. 87–88.)

The *Calvert* court examined the competing parenthood claims under the Uniform Parentage Act (the Act), which was the only statutory framework available at the time for assessing the parties' parenthood claims.[8] The court concluded that both the surrogate and the wife who donated her egg had plausible claims for parental rights under the Act. In that circumstance, the court gave effect to the parties' intent for parentage as expressed in their agreement. The court noted that, "[b]ut for their acted-on intention, the child would not exist." (*Calvert, supra*, 5 Cal.4th at p. 93.) The court observed that "[n]o reason appears why [the surrogate's] later change of heart should vitiate the determination that [the wife] is the child's natural mother." (*Ibid.*) The court rejected the public policy and constitutional objections that the surrogate raised to the parties' contract, concluding that giving effect to the parties' intent "does not offend the state or federal Constitution or public policy." (*Id.* at pp. 87, 95–100.)[9]

---

[8] The Act is now codified at section 7600 et seq.

[9] In *Buzzanca*, the Fourth District Court of Appeal applied the reasoning of *Calvert* to a situation where a surrogate gave birth to a child conceived with the sperm and egg of anonymous donors at the instigation of a husband and wife who subsequently separated. In that case, neither the surrogate nor the husband claimed parental rights, and the trial court concluded that the child had *no* parents. The Court of Appeal reversed. The court held that the wife in that case was "situated like a husband in an artificial insemination case whose consent triggers a medical procedure which results in a pregnancy and eventual birth of a

22

M.C. attempts to distinguish *Calvert* and limit the scope of its holding by noting that the court in that case resolved competing claims of parenthood by two claimed *mothers*: The gestational carrier and the genetic mother of the child. The court acknowledged that "[b]oth women . . . adduced evidence of a mother and child relationship as contemplated by the Act," but concluded that "for any child California law recognizes only one natural mother, despite advances in reproductive technology rendering a different outcome biologically possible." (*Calvert*, *supra*, 5 Cal.4th at p. 92.) Here, of course, the dispute is not between two claimed mothers, but between a claimed mother and Father, the intended parent under the Agreement.

M.C.'s argument misses the broader implication of the holding in *Calvert*. The court held that it could give effect to the parties' intentions for the parentage of the child as expressed in their surrogacy contract because the agreement was "not, on its face, inconsistent with public policy." (*Calvert*, *supra*, 5 Cal.4th at p. 95.) That holding is ultimately dispositive for all of the constitutional arguments that M.C. raises here. Section 7962 permits the parties to a surrogacy arrangement to enter into a legally binding contract—subject to specific statutory safeguards—that determines the parentage of children conceived pursuant to the arrangement. There is no constitutional impediment to giving effect to the parties' intent expressed in such a contract.

---

child." (*Buzzanca*, *supra*, 61 Cal.App.4th at p. 1421.) Therefore, just as in *Calvert*, motherhood could plausibly be established in two women, and the conflict should be resolved by giving effect to the intention of the parties. (*Ibid.*)

23

### a.   *M.C. has standing to assert constitutional claims on behalf of the Children*

Father argues that M.C. does not have standing to assert the Children's constitutional rights on appeal because she is not a parent.  Like his estoppel theory, this argument is inextricably bound up in the merits of M.C.'s appeal.

But for the Agreement, M.C. would have a colorable claim to motherhood based on the fact that she gave birth to the Children.  (See § 7610, subd. (a); *Calvert, supra*, 5 Cal.4th at pp. 89–90; *Robert B. v. Susan B.* (2003) 109 Cal.App.4th 1109, 1115 [woman who gave birth to a child from an embryo belonging to another couple that was mistakenly implanted by a fertility clinic "clearly established a mother-child relationship by the undisputed fact that she gave birth" to the child].)  Thus, Father's standing argument depends upon a conclusion that the Agreement is valid and that by executing it M.C. surrendered any claims to motherhood that she might have.  One of the challenges that M.C. seeks to assert to the Agreement's validity is the claimed constitutional rights of the Children to a parent-child relationship with her.  Whatever the merits of this claim, concluding that she has no standing to assert it because she is not a parent would assume that her argument fails before it is even considered.  We do not believe that Father's standing argument compels such a circular result.

Father relies on the rule that only a "party aggrieved" has standing to appeal under Code of Civil Procedure section 902.  That rule does not help him.  We "liberally construe the issue of standing and resolve doubts in favor of the right to appeal."  (*In re L. Y. L.* (2002) 101 Cal.App.4th 942, 948 [parent had standing

24

to raise the sibling relationship exception to termination of parental rights].)

M.C. has standing to assert her own claimed statutory and constitutional rights to a parent-child relationship with the Children. (See § 7650, subd. (a) ["Any interested person may bring an action to determine the existence or nonexistence of a mother and child relationship"]; *Calvert, supra*, 5 Cal.4th at pp. 89–90. See also *In re Rauch* (1951) 103 Cal.App.2d 690, 694–695 [father had standing to appeal an order declaring his child to be a ward of the court despite a previous order appointing other relatives as guardians and giving them custody of the child].) M.C.'s interest in a relationship with the Children is intertwined with the Children's alleged interest in a relationship with her. She may therefore assert the Children's interests along with her own. "Where the interests of two parties interweave, either party has standing to litigate issues that have an impact upon the related interests. This is a matter of first party standing." (*In re Patricia E.* (1985) 174 Cal.App.3d 1, 6 [father had standing to raise the issue of his minor daughter's right to counsel in a dependency proceeding because "independent representation of the daughter's interests impacts upon the father's interest in the parent-child relationship"], disapproved on other grounds in *In re Celine R.* (2003) 31 Cal.4th 45, 60.)[10]

---

[10] Father also relies on federal cases discussing whether parties had standing to raise constitutional claims under the constitutional and prudential standing requirements in *federal* court. He does not explain the relevance of those cases to this proceeding. To the extent such cases are analogous, they also do not support Father's argument. The United States Supreme Court has found that foster parents had standing to argue their view of the constitutional interests of minor children in a state's

25

In other contexts, courts have found that persons who had no claim to be natural or genetic parents had standing to assert the interests of minor children. (See, e.g., *In re Santos Y.* (2001) 92 Cal.App.4th 1274, 1314, fn. 24 [foster parents could raise the constitutional claims of a minor in a custody dispute under the Indian Child Welfare Act (ICWA) even though they did not themselves possess a fundamental interest in a relationship with the minor under a substantive due process analysis]; *Guardianship of Olivia J.* (2000) 84 Cal.App.4th 1146, 1152–1153 & fn. 7 [appellant could pursue a guardianship proceeding on behalf of a minor who previously lived with her and her partner, despite appellant's status as a nonparent who was a "former participant in a lesbian relationship"].) The fact that the Children are not parties to this appeal and therefore cannot assert their own interests provides further reason to consider M.C.'s arguments on their behalf. (Cf. *In re Alexandria P.* (2014) 228 Cal.App.4th 1322, 1342 [de facto parents lacked standing to raise constitutional challenges to the ICWA on minor's behalf where the minor's counsel and guardian ad litem "sought an outcome consistent with the ICWA's requirements"].) We therefore proceed to the merits of M.C.'s constitutional claims.

---

foster care procedures, even when the children and parents were separately represented parties. (*Smith v. Organization of Foster Families for Equality & Reform* (1977) 431 U.S. 816, 841, fn. 44.) But for the Agreement, M.C. would have at least as much interest as a foster parent in the Children's alleged constitutional right to a parent-child relationship with her. (See *Calvert, supra*, 5 Cal.4th at p. 99, fn. 13 [citing *Smith* and noting that the trial court in *Calvert* had analogized the surrogate's relationship with the child to "that of a foster mother"].)

26

**b.** *Procedural due process*

M.C. claims that the trial court denied her due process rights and the due process rights of the Children under the United States and California constitutions by failing to consider her counterclaim and failing to give her a hearing prior to terminating her claimed parental rights. We reject the argument.

The record shows that the trial court gave M.C. the hearing that section 7962 contemplates. Section 7962, subdivision (f)(2) provides that, "[u]pon motion by a party to the assisted reproduction agreement for gestational carriers, the matter shall be scheduled for hearing before a judgment or order is issued." The trial court did conduct a hearing to determine if the requirements of section 7962 had been met. With respect to the one procedural element of the statute that had not yet been met—a declaration from M.C.'s former attorney—the court heard the attorney's testimony and permitted M.C. to cross-examine.

Section 7962 specifies that the only showing necessary to obtain an order establishing the parentage of the intended parent(s) and extinguishing claims of parental rights by a surrogate is "proof of compliance with this section." (§ 7962, subd. (f)(2).) Upon such a showing, the judgment or order "shall terminate any parental rights of the surrogate and her spouse or partner *without further hearing or evidence*, unless the court or a party to the assisted reproduction agreement for gestational carriers has a good faith, reasonable belief that the assisted reproduction agreement for gestational carriers or attorney declarations were not executed in accordance with this section." (*Ibid.*, italics added.) Thus, section 7962 does not leave room for litigating challenges to the parental rights of intended parents on

any basis beyond the circumstances and content of the surrogacy agreement itself.

The trial court therefore properly denied M.C.'s counterclaim under section 7962, subdivision (f)(2) without further proceedings. The counterclaim did not challenge whether the Agreement fulfilled the requirements of section 7962 or allege that the Agreement was "not executed in accordance with" section 7962. Rather, it asserted broad claims challenging the legitimacy and constitutionality of surrogacy agreements and contesting Father's fitness and intention to be a parent. Under section 7962, subdivision (f)(2), no "further hearing or evidence" was required to consider such claims.[11]

M.C.'s procedural due process claim therefore amounts to a challenge to the constitutionality of section 7962. The crux of the claim is that the statutory scheme improperly permits a surrogate's parent-child relationship to be denied based only upon the intentions expressed in a surrogacy contract without further consideration of the surrogate's post-birth wishes, the intended parent's fitness to be a parent, or the best interests of the children. The substance of M.C.'s procedural due process claim is therefore indistinguishable from her substantive due process and equal protection claims, which are discussed below.

---

[11] In attacking the legitimacy of section 7962 in her counterclaim, M.C. in fact acknowledged the limited showing necessary to terminate a surrogate's claimed parental rights under section 7962: "California's Surrogacy Enabling Statute, C.F.C. § 7962(f)(2) authorizes the court to terminate the parental rights of [M.C.] based solely upon proof that the 'gestational' surrogate signed a surrogacy contract which complies with § 7962 and nothing more."

### c. *Alleged violation of the Children's substantive due process rights*

M.C. argues that the termination of her claimed parental rights under section 7962 violates the Children's liberty interest in: (1) their relationship with their mother; and (2) freedom from "commodification." We conclude that both of these arguments are foreclosed by the court's opinion in *Calvert*.

M.C.'s argument fails in light of her own agreement surrendering any right to form a parent-child relationship with the Children. Her argument amounts to a claim that she either: (1) had no right to make such a promise; or (2) was permitted to later change her mind about that promise based upon the best interests of the Children. Both claims are inconsistent with the court's decision in *Calvert*.

The first claim is a direct challenge to the legitimacy of surrogacy arrangements. If a child's liberty interest in a relationship with its birth mother trumps the surrogate's right to enter into a contract agreeing to surrender the child to intended parents, then no surrogacy arrangement is possible. That result would conflict with the fundamental holding in *Calvert* that surrogacy agreements are not inconsistent with public policy. (*Calvert, supra*, 5 Cal.4th at pp. 87, 95.) It would also run afoul of the court's observation that "[t]he argument that a woman cannot knowingly and intelligently agree to gestate and deliver a baby for intending parents carries overtones of the reasoning that for centuries prevented women from attaining equal economic rights and professional status under the law." (*Id.* at p. 97.)

The second claim conflicts with the court's rejection of the adoption paradigm for surrogacy arrangements. By analogy to the statutes governing adoption, the surrogate in *Calvert* argued

29

that a prebirth waiver of her parental rights was unenforceable. The court rejected that argument, concluding that "[g]estational surrogacy differs in crucial respects from adoption and so is not subject to the adoption statutes." (*Calvert*, *supra*, 5 Cal.4th at pp. 95–96.) The court also held that a decision on the parentage of children born to a surrogacy arrangement is separate from determining custody based upon the best interests of the children, which should be left to the dependency laws. (*Id.* at pp. 93–94, fn. 10.)

The opinion in *Calvert* also precludes M.C.'s argument that surrogacy agreements impermissibly result in the "commodification" of children by permitting their sale. The court in *Calvert* expressly rejected the concern that "the practice of surrogacy may encourage society to view children as commodities, subject to trade at their parents' will." (*Calvert*, *supra*, 5 Cal.4th at p. 97.) Moreover, the court rejected the argument that payments to the surrogate in that case were in exchange for the surrender of her parental rights, instead concluding that they were "meant to compensate her for her services in gestating the fetus and undergoing labor." (*Id.* at p. 96.) Similarly, here, payments to M.C. under the Agreement were for the stated purpose of "compensation for her discomfort, pain, suffering and for pre-birth support" and for living expenses. Moreover, M.C.'s argument that she could not enter into the surrogacy arrangement in exchange for compensation also amounts to a wholesale attack on the legitimacy of surrogacy contracts, which is inconsistent with the holding in *Calvert*.[12]

---

[12] M.C. argues that *Calvert* did not decide this issue because it only considered whether the payment of money to the surrogate in that case violated this state's public policy, not

### d. *Alleged violation of the Children's equal protection rights*

M.C. argues that denying a parent-child relationship between her and the Children violated the Children's right to equal protection under the United States Constitution. M.C. claims that permitting the children of surrogates to be "placed" with intended parents based only upon the intent of the contracting parties without considering the best interests of the children denies such children the consideration given to children in other contexts involving state-sponsored placement, such as adoption and marital dissolution proceedings.

While the court did not consider this argument directly in *Calvert*, we believe that the court's opinion in that case forecloses it. As mentioned, the court concluded that the determination of *parentage* is separate from the question of *custody*. (See *Calvert, supra*, 5 Cal.4th at pp. 93–94, fn. 10.) Whether a particular custodial arrangement is harmful to a child is a subject for the

whether it was constitutionally permissible. The argument ignores the source of public policy against which the validity of contractual provisions is measured. A court's understanding of the public policy affecting a contract is generally derived from constitutional and statutory provisions. (See *City of Santa Barbara v. Superior Court* (2007) 41 Cal.4th 747, 777, fn. 53 [courts "may, in appropriate circumstances, void contracts on the basis of public policy," but " '[t]he determination of public policy of states resides, first, with the people as expressed in their Constitution and, second, with the representatives of the people—the state Legislature,' " quoting *Jensen v. Traders & General Ins. Co.* (1959) 52 Cal.2d 786, 794.) In light of this relationship, M.C.'s claim that surrogacy arrangements could be consistent with California public policy and yet violate the United States and/or California constitutions is illogical.

state's dependency laws, not for the law governing surrogacy contracts.[13]

As applied to M.C.'s equal protection argument, the court's conclusion means that a child's right to suitable *placement* by the state once born is not at issue. Rather, the issue is the extent of state control over individuals' decisions to give birth in the first place.

The court in *Calvert* recognized that the decision of the intended parents led to the birth of the child whose parentage was at issue. "But for their acted-on intention, the child would not exist." (*Calvert, supra*, 5 Cal.4th at p. 93.) A conclusion that children born to surrogates must be placed by the state using the same criteria that apply to adoptions or custody disputes would certainly affect—and perhaps eliminate—the willingness of intended parents to have children through surrogacy arrangements. "[I]t is safe to say that [the surrogate] would not have been given the opportunity to gestate or deliver the child had she, prior to implantation of the zygote, manifested her own intent to be the child's mother." (*Ibid.*)

---

[13] *Calvert* referred to California's dependency laws, which the court explained "are designed to protect *all* children irrespective of the manner of birth and conception." (*Calvert, supra*, 5 Cal.4th at p. 93, fn. 10.) Where, as here, an intended parent resides in another state, different dependency laws would likely apply, but the principle remains the same. One can imagine an extreme set of circumstances that might test the constitutional boundaries of section 7962's summary procedure, such as an intended parent with a history of child abuse who plans to take a child to another country that does not have a functioning dependency system. Hopefully such a case is hypothetical only. In any event, it is not the situation here.

32

Thus, for purposes of an equal protection analysis, it is more appropriate to compare children born to surrogates with children born in a traditional manner to other parents than it is to compare children born to surrogates with children *placed* through adoption or family courts. Of course, the state does not regulate who is permitted to give birth. "What a far different experience life would be if the State undertook to issue children to people in the same fashion that it now issues driver's licenses. What questions, one wonders, would appear on the written test?" (*Harding*, *supra*, 2016 U.S. Dist. LEXIS 73466 at pp. *23–24, fn. 9, quoting *J.R. v. Utah* (D. Utah 2002) 261 F.Supp.2d 1268, 1298, fn. 29.)

Thus, M.C.'s equal protection argument on behalf of the Children does not provide any ground for reversal.

### e. *Alleged violation of M.C.'s constitutional rights*

M.C. argues that the trial court's order terminating her claimed parental rights violated her substantive due process and equal protection rights in several respects. Her arguments can be grouped into two categories for purposes of discussion. First, she claims that she has a constitutionally protected liberty interest in a relationship with the Children that she could not waive before their birth. She argues that permitting such a prebirth waiver would also violate her equal protection right to be treated similarly to mothers who surrender their children through adoption. Second, she argues that surrogacy arrangements are impermissibly exploitative and dehumanizing. Again, we conclude that these arguments are foreclosed by *Calvert*.

M.C. argues that *Calvert* did not hold that a surrogate can never have a liberty interest in a relationship with the child that

33

she bears.  She correctly points out that the court's analysis in that case was colored by the need to weigh the surrogate's interests against the interests of the genetic mother, and that such balancing is not necessary here.  (See *Calvert*, *supra*, 5 Cal.4th at p. 100 [the surrogate "fails to persuade us that sufficiently strong policy reasons exist to accord her a protected liberty interest in the companionship of the child when such an interest would necessarily detract from or impair the parental bond enjoyed by [the intended parents]"].)

We need not determine the scope of the court's ruling on this issue, because the opinion otherwise makes clear that a surrogate can permissibly contract to surrender whatever parental rights she has.  The court held that the surrogacy contract in that case was consistent with public policy.[14]  The court rejected the argument that "a woman cannot knowingly and intelligently agree to gestate and deliver a baby for intending parents" as antiquated and dismissive of a woman's "equal economic rights." (*Calvert*, *supra*, 5 Cal.4th at p. 97.)  Here, as in *Calvert*, there is no suggestion that M.C., who had children of her own and had previously served as a surrogate, "lacked the intellectual wherewithal or life experience necessary to make an informed decision to enter into the surrogacy contract." (*Ibid.*)

---

[14] As discussed *ante*, we are not persuaded by M.C.'s assertion that "the public policy considerations raised in [*Calvert*] are not applicable to a constitutional challenge."  We do not believe that our Supreme Court would have held that the surrogacy contract in *Calvert* was consistent with public policy if it believed that the surrogacy arrangement violated a constitutional right.  Of course, the Legislature has also now expressed its view of the permissibility of surrogacy arrangements by enacting section 7962.

M.C.'s argument that, like mothers giving up children for adoption, she could not knowingly waive her parental rights until *after* she had given birth also fails in light of the Supreme Court's holding in *Calvert.* The court rejected the surrogate's argument in that case that the policies underlying California's adoption laws were violated by the surrogacy contract because it amounted to a "prebirth waiver of her parental rights." (*Calvert, supra,* 5 Cal.4th at p. 96.) The court concluded that "[g]estational surrogacy differs in crucial respects from adoption and so is not subject to the adoption statutes." (*Ibid.*)

Finally, the court in *Calvert* expressly rejected the argument that surrogacy contracts violate public policy because they "tend to exploit or dehumanize women." (*Calvert, supra,* 5 Cal.4th at p. 97.) In particular, the court found that, "[a]lthough common sense suggests that women of lesser means serve as surrogate mothers more often than do wealthy women, there has been no proof that surrogacy contracts exploit poor women to any greater degree than economic necessity in general exploits them by inducing them to accept lower-paid or otherwise undesirable employment." (*Ibid.*) More generally, "[t]he limited data available seem to reflect an absence of significant adverse effects of surrogacy on all participants." (*Ibid.*)

We therefore conclude that that the Agreement did not violate the constitutional rights of M.C. or the Children. The trial court's ruling was consistent with the requirements of section 7962 and the court's decision in *Calvert.* M.C. has presented no ground to reverse the trial court's ruling.

## DISPOSITION

The trial court's February 9, 2016 judgment is affirmed. Plaintiff and Respondent C.M. (Father) is entitled to recover his costs on appeal.

CERTIFIED FOR PUBLICATION.


LUI, J.


We concur:


CHANEY, Acting P. J.


JOHNSON, J.